CORNELIUS F. KNIGHT v. HENRY U. LINZEY, IMPLEADED
WITH J. DAVISON.

*Bills and notes—Bohemian oat note—Action by defrauded party—
Knowledge of maker as to character of transaction—
Public policy.*

1. An innocent party, who is defrauded into giving his promissory
   notes, is not obliged, upon information received from the party
   who defrauded him, or upon any other information short of a
   certainty, to contest the validity of the notes in the hands of
   a purchaser who was a stranger to the original transaction,
   and who is presumably an innocent holder of the paper.
2. An instruction to the jury in a suit to recover money paid to
   an alleged innocent purchaser of Bohemian oat notes, on the
   ground of the fraud of the defendant in securing the notes,
   from which the jury may infer that the payor had a right to
   rely upon the statements of the defendant, independent of his
   own knowledge and belief, and that, not being equally in
   fault, he might recover back the money so paid, although he
   knew at the time he gave the notes that the whole scheme
   was a fraud, and that, if he won, it must be that some one
   else would lose by   like transaction, out of which he must
   obtain his profit, is not good law.

Error to Shiawassee. (Newton, J.) Argued April 17,
1890. Decided May 2, 1890.

Case. Defendant brings error. Reversed. The facts
are stated in the opinion.

*Watson & Chapman,* for appellant.

*S. S. Miner* and *A. L. Chandler,* for plaintiff.

MORSE, J. This is another Bohemian oat case, and
comes here from the Shiawassee circuit court, where the
plaintiff recovered judgment. The declaration is framed
upon the same theory as those in *Hess v. Culver,* 77 Mich.

598, and *Pearl v. Walter,* 80 Id. 317. The plea was the general issue. The same objection was made to the introduction of proof under the declaration as we have recently noticed in *Pearl v. Walter, supra,* and will need no further attention.

The principal points raised in the case relate to the charge of the court. It was alleged in the declaration that the plaintiff was induced to make two notes, one for $100 and one for $200, and that these notes were sold before due, by the defendant Linzey, to an innocent purchaser for value. It appeared upon the trial that the $200 note was sold before due to one Edward Rose, and the $100 note to one Silas Frye, and that the plaintiff had paid them to these parties before bringing suit. Linzey sold the note to Rose; and Davison, the note to Frye. Linzey testified that he told both Rose and Frye, before they purchased the notes, that they were given for Bohemian oats, and that he informed plaintiff of this fact before he paid the notes. Plaintiff, however, denies that Linzey told him anything of the kind; and Rose and Frye swear that they did not know the notes were given for Bohemian oats until after they purchased them. Reuben Johnson testified that he heard Linzey tell Rose that the note was given for Bohemian oats before Rose bought it; and two other witnesses swore that they heard Linzey tell plaintiff that, if he was in Knight's place, he would not be in a hurry about paying the notes, as Rose knew what they were given for before he purchased.

The counsel for the defendants insisted upon submitting to the jury the question whether or not Rose and Frye, or either of them, were innocent purchasers of the notes, and requested the court to instruct the jury that, if they found both of them not to be innocent purchasers, and plaintiff knew it, his payment of the notes to them was voluntary, and he could not recover, or, if either

one of them was not an innocent purchaser, and plaintiff knew it, he could not recover for the note held by such one, and also submitted the following request, in addition:

"9. The notes in question in this suit were void, and the purchasers thereof are supposed to know for what they are given, and could not recover upon the notes of plaintiff until they first proved, by a preponderance of evidence, that they were innocent purchasers of the same; and it became the plaintiff's duty to make a fair and diligent inquiry into the facts, and ascertain whether they were innocent purchasers, before he paid the notes, and, if he paid them without making such inquiry, then he made the payment voluntarily, and cannot recover in this case; and, before he can recover, he must prove, by a preponderance of evidence, that said Rose and Frye were innocent purchasers of the notes."

The court gave these requests, but qualified the last or ninth by adding:

"Unless you find that he was fraudulently influenced to make and deliver the notes by Linzey, the defendant, or by Davison in the presence of Linzey."

Counsel also requested a charge as to each note, that, if they found the purchaser (Rose or Frye) not an innocent purchaser, and that he knew for what the note was given, then the plaintiff, if before payment he had been reliably informed of facts which showed that such purchaser was not a *bona fide* one for value, was not obliged to pay the same, and it became a voluntary payment, and he could not recover of Linzey the amount of such payment. This was given, with the following qualification:

"Unless the jury should find that there was fraud practiced on the plaintiff in obtaining the notes from him by defendant and Davison, and of which fraud plaintiff had no knowledge or information when he gave said notes."

These directions were, if anything, more favorable to the defendants than the law is. If the plaintiff, an inno-

cent party, was defrauded into giving these notes, he was not obliged, upon information obtained from the party who had defrauded him, or any other information short of a certainty, to contest these notes in the hands of a stranger to the transaction of their inception, and who would be presumably an innocent holder of them. He was not compelled to take the chances of two lawsuits to obtain relief from, or redress for, the fraud committed upon him.

The court charged the jury, substantially as requested by the defendants, that if the plaintiff entered into the transaction, knowing that in the end some person or persons must be defrauded, and knew how the oats were bought and sold, then plaintiff and defendants were engaged in a transaction against public policy, and therefore void; and the law would leave each of them where they had left themselves, without redress, and the plaintiff could not recover if he knew of the common fraud. This charge was correct, but it is claimed that the circuit judge entirely neutralized the effect of it by stating subsequently in his charge as follows, it being the plaintiff's third request:

"Knight had a perfect right to rely upon the statements of Linzey, and was not bound to seek information elsewhere, and Linzey was bound to make true statements to Knight; and, if he made false statements to Knight which were material, and Knight relied upon such statements, and believed them, and parted with his two promissory notes, and afterwards paid said notes, and Knight was not equally in fault with Linzey, then Knight would be entitled to recover."

The court further said in his general charge, in reference to this subject:

"I charge you that if two men, of equal knowledge, enter into a contract, deliberately, for the purpose of doing an act which is fraudulent, and the tendency of which is to contravene the principles of the common law,

or in violation of the statute, then each would be equally in fault; and, so long as the contract remains unperformed, neither party would be aided at law or in equity to its enforcement. The law would leave them where they had placed themselves. But if they were not equally in fault,—and this doctrine applies where the action is brought upon the contract,—if one of them was influenced by the judgment of the other, did not act upon his own knowledge of the facts, and was ignorant of the facts until he was informed by the other party of their existence, and relied upon the judgment of the other party, and upon his statements of the facts communicated to him by the other party, and believed them to be true, and then relied upon the judgment of that other person, he at the time believing and relying upon that other person as to the existence of the facts communicated to him, as to the honesty of the subject-matter of the contract entered into,—of its being lawful,—he would not in such case be a knowing and guilty participant in the violation of law, or in contravention of public policy.

"If the plaintiff in this case had no knowledge of the scheme of the Bohemian oat business,—had no knowledge or information of the corporate existence of the pretended company, or the want of integrity of its purpose, and the honesty of its business,—and relied entirely upon the defendant's statement, from his long acquaintance with him, and believed that the corporation was organized as stated, and believed that its business was an honest one. and his own judgment was insubordinated to that of the defendant and the man Davison, or either of them, he would not be equally to blame as those from. whom he got his information, and on whose judgment he relied."

This part of the general charge was certainly good law, well and clearly expressed.

But following this the court referred to the legislative act of 1887 as being aimed, not at the man who made the note, but at the one who procured it and put it in circulation. He said that the act did not apply to or govern the case in hand, as the notes were made long before it passed, but that he referred to it as illustrating the views of the prominent men who composed the Legislature.

"It makes a man a criminal who procures a note by falsehood, and puts it in circulation, but does not say anything about the man who gives the note."

He then closed his directions as follows:

"I therefore charge you that if you find that Linzey, in the presence of Davison, made the representations stated in the declaration,—whether he knew them to be false or not would make no difference,—and the plaintiff was influenced thereby, and relied upon them, and believed them to be true, and acted upon them, then he would not be equally at fault; and, if the plaintiff has been injured thereby, he will be entitled to recover the amount he actually paid, with interest at six per cent. from the time of payment to date. But if he had knowledge, and he acted upon his own knowledge and judgment, knew that the scheme was fraudulent, and made a contract for gain. and was equally guilty of contravening public policy, then your verdict should be for the defendant."

"The action is brought for the fraud which he alleges was practiced upon him, and not upon the contract that was made, and the contract is referred to for the sole purpose of proving the extent of the injury sustained, in case of fraud practiced. The plaintiff must prove fraud by a preponderance of evidence that satisfies you of that fact, and you must find that the plaintiff did not knowingly participate in it. A man cannot very well be said to participate in an unlawful act when his mind is a blank so far as the facts are concerned; and where the facts are stated by another, and impressed upon his mind, his act is built upon the declarations and information conveyed by that other, and of which he has no independent knowledge. The conduct and representations of the defendants Linzey and Davison may be considered by you in determining the relations of this party to the fraud, if one was committed; and you may consider, also, what took place soon after by these two men, in the absence of the plaintiff, in disposing of the notes."

It is very plain to me that the jury must have been misled by the instructions of the circuit judge, taken as a whole. The third request of the plaintiff, as given, is

not sound law. It must be conceded that Knight was not equally in fault with the defendant Linzey, as Linzey was the moving party in the fraud, and by his persuasion and representations influenced Knight more or less in the transaction. But if Knight knew it was a fraud, and went into it solely for the purpose of making money out of it, knowing that, if he made any money, some innocent third party must be defrauded thereby, and that this was the natural outcome of the scheme, the law will not permit him to recover back from Linzey what he paid to him, as it would be money knowingly paid in furtherance of fraud; and a recovery, under such circumstances, would be against public policy.

"The benefits and burdens growing out of the illegal business cannot be distributed or equalized. The law will have nothing to do with the transaction in any way, except to declare it void." *Ward v. Doane,* 77 Mich. 335.[1]

Under this third request the jury may well have inferred that Knight had a right to rely upon the statements of Linzey, independent of his own knowledge and belief, and, being not equally in fault, might recover back the money paid upon the notes, although he knew at the time he gave them that the whole scheme was a fraud, and that, if he won, it must be that some one else would lose by a like transaction, out of which he must obtain his profit. This is not the law.

The latter part of the general change was also misleading. The court said:

"But if he had knowledge, and he acted upon his own knowledge and judgment, knew that the scheme was fraudulent, and made a contract for gain [and was equally guilty of contravening public policy], then your verdict should be for the defendant."

The insertion of the clause which ⳑ have inclosed in

---

[1] The word "distributed" reads "disturbed," as printed in 77 Mich. 335,—a palpable mistake.

brackets made that bad law which would have been good law without it; for, if he knew the scheme was a fraud, and acted upon his own knowledge and judgment, he could not well have been deceived by the defendants, and whether or not he was equally guilty with them of contravening public policy became of no moment. In such a case the plaintiff would take his chances, as does one upon the throw of a dice-box.

Unless the jury was misled by the charge of the court, it would naturally seem, from the plaintiff's own testimony, that they must have found against him. He testified on cross-examination as follows:

" *Q.* You are a school-teacher, or was?

" *A.* I taught school a few terms.

" *Q.* Until you found you could make more money as ɐ farmer than a teacher? Why did you go into the Bohemian oat business,—for what purpose? What was the object of it?

"*A.* I supposed I would make a little money out of it, according to their representation.

"*Q.* You went into the Bohemian oat business, knowing it was a fraud and a swindle, for the purpose of making money,—thought you could, the way it was represented to you?

"*A.* Yes, sir.

"*Q.* You didn't go into it for any other purpose than to make money?

"*A.* Not a bit; no, sir.

" *Q.* You understood it to be a fraudulent, but a money-making, scheme, by which you were going to have sold forty bushels of oats at fifteen dollars per bushel—did you not?

"*A.* Yes, sir.

"*Q.* And that was the inducement that led you to get into it, believing that you could make that much money out of it, though you knew it was a fraud?

"*A.* I thought I could make some money out of it.

"*Q.* I asked you if you knew it was a fraud, and that to make money was the inducement that led you to go into it?

"*A.* Yes, sir.

"*Q.* You didn't expect the Bohemian oat business could run always, did you? You thought it would go down at some time?

"*A.* I didn't know it would.

"*Q.* I ask you, didn't you think that it would have to go down some time?

"*A.* I didn't know but it might.

"*Q.* Didn't you expect it was going down at some time?

"*A.* I didn't know whether it would or not.

"*Q.* Didn't you expect it was going down at some time?

"*A.* Yes, sir.

"*Q.* But you didn't expect it was going down before your bond was raised?

"*A.* I didn't know anything about that.

"*Q.* You didn't think it was going down before your bond was raised, did you?

"*A.* I didn't know that it would.

"*Q.* You didn't think it would?

"*A.* No, I did not.

"*Q.* But finally you thought some one would get caught just as you have been caught now?

"*A.* I didn't know they would.

"*Q.* I am not asking you what you knew, but if you thought that.

"*A.* Yes, sir.

"*Q.* At the time that you went into it?

"*A.* No, sir; I did not know that anybody was going to get caught.

"*Q.* I am not asking you what you knew about the scheme. Did you know how the business was done?

"*A.* Yes, sir.

"*Q.* I ask you now, and you have told me that you expected it was going down,—that thing could not run always. You expected it would go down,—that somebody would lose on it,—didn't you?

"*A.* Yes, sir.

"*Q.* You knew they must lose, didn't you?

"*A.* Yes, sir.

"*Q.* So you knew, if your contract was carried out, some one would, in the end, lose his money?

"*A.* Yes, sir.

"*Q.* And you thought you would make some out of it?

"*A.* Yes, sir; I thought I would make a little.

"*Q.* You went into a speculation to make something for nothing, and got left, didn't' you?

"*A.* Yes, sir; a three hundred dollar note."

It is suggested that many of these questions were double, and therefore misleading; that the answers might have referred to the first part of these double questions, and not to the whole; and that plaintiff did not understand the full import and meaning either of the questions, or the questions and answers taken as a whole. But the testimony above quoted was the last evidence he gave as to the reasons that actuated him in going into this transaction, and remains unexplained in the record. It may be that he was led into these statements by the skill and ingenuity of the attorney who cross-examined him; but, if so, his attorney did not, for some reason, attempt to get him out of the trap into which he had fallen, if trap it was. But, unexplained, the logic of this testimony was that Knight well knew what the scheme was,—that it was a fraud and a swindle for the purpose of making, and the inducement for going into it was to make, money fraudulently; and he also knew that, if his contract was carried out, somebody, in the end, must lose money by his gain. He went into this fraud "expecting to get something for nothing, and got left." What matter is it to the courts, under this testimony, whether or not Linzey made false representations to the plaintiff? Upon this evidence, unexplained, the plaintiff plainly barred himself from recovery.

While the Legislature has wisely shaped the law so as to punish criminally the men who are travelling about the country procuring notes like these, and as Linzey procured this one, there still is no redress for the plaintiff, under his own showing, against these defendants, until the Legislature shall see fit to provide him a remedy by statute. The unwritten law will give him no relief, and,

in my opinion, very properly leaves him where he has put himself, because he went into it with full knowledge of what he was doing, and that the transaction was unlawful. His testimony does not show a case "where he was influenced by the judgment of the other," or that he—

"Did not act upon his own knowledge of the facts, and was ignorant of the facts until he was informed by the other party of their existence, and relied upon the judgment of the other party, and upon his statements of the facts communicated to him by the other party, and believed them to be true, and then relied upon the judgment of that other person, he at the time believing and relying upon that other person as to the existence of the facts communicated to him as to the *honesty of the subject-matter of the contract* entered into,"—

And believed it to be lawful. In view of his testimony above quoted, it cannot be said that the representations to plaintiff that the company was incorporated could have influenced him to believe the transaction lawful; for it is not to be presumed that, knowing what he says he did about the scheme, he would believe that such a fraud could be legalized by incorporation, or that such a swindle as the plaintiff admits he knew this to be would be permitted, much less made lawful, by the State.

This is a different case from that shadowed forth in the declaration in *Pearl v. Walter,* ante, 317, where the plaintiff was afraid there was "something wrong" in it at first, but had his fears overcome and his suspicions removed by the representations of those who seemed to know more than he did about the matter. Here the plaintiff says he knew it was a fraud, and that he could not gain unless some other person than defendants lost, and that, really, the only inducement that led him into it was his cupidity and greed. He was not actually deceived, and he was "consciously wrong." See *Hess v. Culver,* 77 Mich. 598. He knew what the fraud was, but

thought he might get his money out of it, and the profit with it, before the scheme collapsed. He took the chances that the fraud might not be operated upon him, but upon some one else for his benefit.

The verdict should have been, as the record stands, for the defendants. It may be that on another trial the plaintiff may make a better showing as to his want of knowledge of the fraud, and his reasons for entering into it; but, as the case appears here, a new trial must be granted to the defendants, with costs of this Court, and the judgment of the lower court reversed.

The other Justices concurred.