STEWART et al v. WRIGHT.

(Circuit Court of Appeals, Eighth Circuit.   June 21, 1906.)

No. 2,138.

**1. EVIDENCE—SIMILAR FACTS—CONSPIRACY TO DEFRAUD.**

Where, in an action to recover money alleged to have been obtained from plaintiff by means of a confidence game, it was charged that there was a conspiracy between the defendants to deprive persons of their money by fraud and deceit. evidence as to other cases of a similar character to that in which plaintiff was defrauded, in which defendants acted in concert for the same purpose, was admissible.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 405.]

**2. CORPORATIONS—TORTS OF OFFICERS—LIABILITY.**

Where a banking corporation, knowing that defendant B. and his associates were engaged in a confidence game, assisted in the furtherance of the scheme, both by representing to the victims as they were brought in that B. was a man of standing, entitled to credit. and by lending B. banking facilities, with which alone he was enabled to conduct his scheme and collect drafts, etc.. drawn by the victims before payment could be stopped, and the officers of the bank themselves, with knowledge that the victims were to be defrauded, drew drafts for such victims, and telegraphed to other banks to ascertain the victims' responsibility, the bank as a corporation was liable as a party to the scheme.

**3. ACTION — GROUNDS — FRAUDULENT TRANSACTION — RECOVERY OF MONEY —PARTICEPS CRIMINIS—IN PARI DELICTO.**

B. and his associates, who were confidence men engaged in enticing others to their city and swindling them out of their money by means of pretended foot races, induced the plaintiff to come and while there to wager money represented as belonging to B. upon the result of such a race upon promise of a percentage of the expected winnings.  It was falsely represented to plaintiff that the foot race had been fixed so that B. would certainly win.  It was also represented that the men with whom the wagers were made were wealthy miners. whereas in fact they were not miners, but were secretly associated with B., and were members of his band of swindlers, as were also the foot racers.  B. pretended to act as stakeholder, and to secretly withdraw moneys from the stakes from time to time, and to pass them to plaintiff to be again wagered.  Plaintiff was a'so induced to wager his own money upon the pretended foot race. Plaintiff did not win, and it was never intended by the swindlers that he should win.  All of the acts and pretenses of B. and his associates were false and fraudulent, and were part of a prearranged and frequently practiced scheme to defraud.  *Held* that, although the plaintiff thought that he was participating in a scheme to defraud others, that he was doing so existed not in fact, but only in his own mind. and all that he did operated solely to defraud himself; that he was not particeps criminis in any unlawful proceeding, and was not in pari delicto with the swindlers who defrauded him, and was not deprived of his right to recover his money.

**4. SAME.**

Plaintiff having made no attempt to enforce the contract or recover the fruits thereof. but having repudiated the same and sued to recover the money of which he was defrauded. he was not deprived of such remedy by the maxim ex dolo malo non oritur actio.

Sanborn, Circuit Judge, dissenting.

147 Fed.—21

In Error to the Circuit Court of the United States for the South-western Division of the Western District of Missouri.

This was an action by Wright against Joseph C. Stewart, James P. Stewart, and the Exchange Bank of Webb City, a Missouri corporation, to recover the sum of $5,100, alleged to have been obtained from him by false and fraudulent pretenses. A jury was waived, and the cause was tried by the Circuit Court, which made a 'general finding, and rendered judgment in favor of the plaintiff. Wright v. Stewart (C. C.) 130 Fed. 905.

W. R. Robertson and A. E. Spencer, for plaintiffs in error.

J. W. Halliburton (Samuel McReynolds and Hiram W. Currey, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. The charge in the petition is that the defendants, Stewart and the bank, acting in combination and concert with a number of swindlers and confidence men, obtained from the plaintiff, Wright, the sum of $5,100, and that it was accomplished by means of a pretended foot race, the result of which was secretly arranged in advance, and by inducing the plaintiff through various false pretenses to place his money temporarily in the possession of one Boatright, the leader of the swindlers, who pretended to be acting as a stakeholder in the betting, and who promised to return the money so soon as it served the temporary purpose of relieving him (Boatright) from a false and simulated embarrassment arising out of the manipulation of the stake money in his hands.

For some years there existed in Webb City, Mo., an organization styled an athletic club, the ostensible purpose of which was the promotion of athletic sports and pastimes. It was really an organized band of swindlers, some of whom masqueraded as wealthy miners, and so notorious did they become that they were commonly known in the community as the "Buckfoot gang," and their continued operations became an intolerable public scandal. The only branch of their operations with which we are concerned is the fake foot racing, so called. Their plan was to entice men of means to Webb City, and deprive them of their money by various pretexts and devices in connection with foot races, the result of which was always secretly prearranged. Complaints and protests from the victims were sometimes met by threats, with a show of force. Their operations covered a wide territory, extending from Iowa to Texas, and they had a regular staff of decoys in the field. The victims were selected with great care, and various stories were told to induce them to go to Webb City. Their vanity and sympathy were sometimes played upon, and always their cupidity and desire for ill-gotten gain. Some of them were falsely assured at the outset that they were not expected to hazard their own money upon the races, but were told that it would be well for them to take along letters of credit or drafts, to impress the others at Webb City with their responsibility and financial standing. Sometimes the scheme outlined to the intended victims was that they assist

in doing an act of justice to a foot racer of great merit who had been unfairly treated in the past, and who intended to match himself with one backed by the club, whom he could easily defeat. At other times the pretended purpose was to enable Boatright, the chief of the swindlers and the president of the club, to discipline his co-members, who were getting beyond his control, and this was to be accomplished by winning their money on a foot race, the result of which was pre-arranged, and after thus demonstrating that they were at his mercy the money should be returned. Sometimes the victim was induced to bet upon what he was led to believe was a certain and assured result of a foot race. In other instances he was to be a stakeholder, and in still others, as in the case at bar, he was, upon a promise of a percentage of the winnings, to handle and bet the money secretly furnished him by Boatright, who was to act as stakeholder, and pretended that he did not wish it known that he was doing the betting. But, however the scheme varied in its details, the ultimate purpose always in view was to beguile the victim to bring money or to arrange that drafts be honored by his home bank; to get actual possession of his money by some pretext or another when at Webb City, and in doing so to place him in such a position that to complain or make trouble for them he would have to admit his own moral obliquity. They seemed to be vaguely aware of the maxim "in pari delicto," and prepared to use it as a shield of defense. To induce a victim to bring letters of credit or drafts, or to arrange for the honoring of drafts by his home bank, it was represented that the advent of a stranger upon the scene, possessed, apparently, of considerable means, was essential to the consummation of the scheme. By slow, cautious, and progressive approach, and with the wiles employed by confidence men, they generally succeeded in securing the trust of the victim, and he was induced to go to Webb City with one or more of the decoys. In some instances, as in the case at bar, they were met outside of the city by Boatright, who would hand the victim several thousand dollars in currency to wager upon a race, the result of which was alleged to be not in doubt. One of the numerous conspirators would then accompany the victim to the defendant bank to see that the money was safely deposited there, and it would be suggested to him that he exhibit to the bank officials, the Stewarts, proof of his own financial resources. He would then be conducted or directed across the street to a saloon, where the subject of foot racing would be casually mentioned, and where he would be introduced to Boatright as though they had met for the first time. The members of the band would quickly gather, and they would then adjourn to a room above the saloon, represented to be the headquarters of the club. A foot race would be arranged, the betting would grow fast and furious, and large sums of money would apparently be wagered. The victim would bet the money which had been given him by Boatright, and the latter would from time to time secretly pass him sums taken from the stakes or money which had already been wagered, and the victim would in turn wager them upon the result of the proposed race. Then someone with a

quarrelsome and truculent manner would claim that he had made a bet which had not been recorded, and would demand a count of the money in the hands of Boatright in order to prove his assertion. Boatright, who is said to have been a consummate actor, would appear to be in great distress, and in fear of the vengeance of the others should they discover that he had abstracted money from the stakes and handed it to the stranger to be wagered. The victim would then be induced by Boatright's pleading to make drafts upon his own bank, which would be cashed at the defendant bank, and the money would be placed, as he supposed temporarily, in the hands of Boatright, to relieve the latter from his embarrassment. When this was done the disturbance would cease, and, if there was no chance to secure more money from the victim, the betting would be closed, the money would be quickly placed in a satchel, and deposited in a place safe from the reach of the victim—sometimes in the defendant bank. The crowd would then adjourn to the place where the pretended foot race was to be run, and the man who the victim thought would win the race would fall down or otherwise fail in his pretended endeavor. It would then be claimed that the victim had wagered his money on the race, and if he evinced a disposition to make trouble revolvers would be drawn, and he would be cowed into submission. This was but one of the various methods employed to rob the victims of their money. The details of the scheme were frequently changed to suit the exigencies of the particular case, but the result was always the same. No stranger ever won anything, and none ever escaped without being defrauded. In some cases their money was given up under circumstances almost amounting to duress. We need not further particularize the facts in Wright's case, except to say that, while protesting that he was being robbed and demanding the return of his money, he was nevertheless induced to hold one end of the string at the pretended foot race.

Was the connection of the defendants with those practices sufficiently established by the evidence? There was substantial evidence to the following effect: The Exchange Bank is a corporation organized under the laws of Missouri. The capital stock was almost wholly owned by James P. Stewart, Joseph C. Stewart, and W. C. Stewart, and they composed the board of directors of the corporation. Joseph C. Stewart was president and James P. Stewart was cashier. Both the president and the cashier knew, and had known for years, of the character of the operations of Boatright and his associates. They knew that no victim who was decoyed by them to Webb City ever escaped without loss. This was a notorious fact, and it was generally recognized in the community in which they lived. They also knew that the foot races were mere pretenses, and were a part of the scheme to defraud. The victims who were decoyed to Webb City were induced to meet the cashier soon after their arrival. They frequently made inquiries as to Boatright's standing and responsibility, and in every instance in which they did so they were informed, in substance, that Boatright was a trustworthy man, and that reliance could be

placed in what he said. This, of course, was false, and was known to be so when the recommendation was given. When the victims deposited in the bank the money Boatright had given them, and exhibited their letters of credit to the cashier, information was given by him that money could be obtained on them. In various instances telegraphic inquiries were made in the name of the bank as to the financial standing of the victims, and whether drafts drawn by them would be honored. Facilities were furnished at the bank enabling them to obtain money, and the officers knew the purpose for which it was being obtained, and that Boatright and his associates would soon get it from them. The cashier of the bank even prepared drafts and checks for the victims to sign, and instead of sending them for collection through correspondent banks, which might be by a circuitous route that would consume time, they would be sent direct to the bank upon which they were drawn, with the result that they were generally honored and paid before payment could be stopped. In one instance the stake money held by the victim, together with some of his own money, which he had been induced to place with the stakes as a guaranty of his good faith and responsibility, was handed to the cashier for safe-keeping, and when the usual climax arrived, and the victim protested that he had not wagered his money, the cashier took the side of Boatright and his party in the discussion. A suit upon a draft upon which payment had been stopped was withdrawn by the bank after a defense had been interposed asserting the criminal connection of the bank and its cashier with the swindling scheme. It was quite a common thing for members of Boatright's organization to accompany the victims on their journeys to the bank to see that they did not escape. Some of the disturbances which arose after the fraud was discovered occurred in the bank. The bank was the depository of the moneys used in the operations of Boatright and his associates. In the case at bar Wright informed the cashier of what was going on. The cashier told him that he could obtain money on his letter of credit; also that Boatright was all right. He afterwards prepared the checks for Wright's signature, and gave him the money, which was soon taken from him.

All of this can lead to but one result. It is certain that had it not been for the bank with its facilities and the aid and assistance of its controlling officers the swindling operations could not have been carried on successfully. The bank was a necessary link in the scheme to defraud. Its name, character, and influence were constantly employed to give Boatright a false standing with his victims. Its corporate instrumentalities were knowingly used in the perpetration of the fraud, and in making it difficult, if not impossible, for them to protect themselves after the discovery of the imposition practiced upon them. Without the active, affirmative assistance of the bank and its officers Boatright and his associates could not have successfully conducted their schemes for so many years. The evidence is overwhelming as to the active connection of James P. Stewart, the cashier, and we are of the opinion that it is also sufficient to uphold the finding of the

Circuit Court against Joseph C. Stewart, the president. There was evidence tending to show that he was at the bank daily; that he knew Boatright and his most prominent associates, the character of the business they were engaged in, and that the checks and drafts of their victims were being cashed by the bank for use in the foot-racing transactions. He knew of litigation that had ensued over the transactions and, notwithstanding all of this, he allowed the bank of which he was president to be actively employed in the consummation of the frauds. He admitted, in the absence of the cashier, that at one time Boatright and his party had accounts in the bank, and that there was an arrangement by which the bank charged up to those accounts the amounts of the defaulted drafts of their victims w' 'ch it had cashed. There can be no explanation of this except upon the theory that the bank and its officers were aiding and assisting the others in the perpetration of their frauds. The admission referred to was distinctly one of complicity. There was also proof that, even after Boatright and his associates had ceased having open accounts in the bank, the latter was still protected by them from loss upon defaulted drafts. There was evidence tending to show these facts, and in our opinion it is sufficient.

In these fraudulent operations the bank was not a mere third party, pursuing the lawful tenor of its way and confining itself to its legitimate business. On the contrary, it was an active participant in the scheme, and its aid and assistance were most helpful. While it did not decoy the various victims to Webb City, nevertheless after their arrival it assisted in despoiling them. The cashier of the bank had charge of one important station in the scheme. As one after another of the victims, some of them doubting and hesitating, were convoyed to the bank and presented to him, he did his part by falsely vouching for the character of Boatright, and so purposely and designedly encouraged them to proceed. Thereafter the bank, through its managing officers, took advantage of the physical and mental condition of the victims, at times of distress and alarm, which its cashier had materially assisted in creating, and employed its corporate facilities in such a way that their money was transferred from their distant homes to Webb City with the knowledge that it would surely be taken from them. No other agency than a bank could have fulfilled this part in the scheme; it was peculiarly suited to the task. The respect with which a bank and its officers are generally regarded and the confidence reposed in them by the public were utilized in a cunning and effectual way. With full knowledge of the methods of the other conspirators and their designs, born of past experience and participation, the managing and controlling authority of the bank assisted in the accomplishment. Had the cashier told the truth regarding the character of Boatright; had he informed the inquiring victims of the plan that was afoot against them; had he refused to draw the checks and drafts and to cash them; had the president and cashier of the bank declined to allow it to be employed as an agency in obtaining information as to the financial worth of the victims and in bringing the money within the reach of the other conspirators to be stolen—the scheme would have been shorn of most of its potency.

In defense of the bank and its officers it is said:

"If one sees another about to fall into a pit, ordinary humanity would induce him to cry out and warn him of the danger. But the duty is of that imperfect kind, of which conscience is the only sanction." Bramock v. Bouldin, 4 Ired. 61.

That is true, but it does not apply to him who assists in preparing the pathway to the pit, and speeds the victim on his way. We would seem to lack perception of the true nature of things were we to be deceived or blinded by the screen of pretense which the conspirators raised to mask their operations. Courts should be as astute to discover and discern the truth as the guilty are to conceal it.

In the consideration of this case the court was not confined to what was said and done to Wright. The charge in the petition is one of conspiracy between the defendants and Boatright and his more active associates, and for proof of such a charge resort was properly had to other cases of a similar character in which concert of action appeared. The going of Wright to Webb City and his departure was but an episode in a long chapter, and it is not to be expected that in his experiences alone will be found all of the proof of the complicity of the bank and its officers.

There is no difficulty in the legal aspect of the case, so far as the bank is concerned. A wealth of ancient precedent may be found in the common law declaring an almost complete immunity of corporations from liability for the torts of their officers and agents, and its influence may also be discerned in some of the earlier decisions of this country. The rationale of the doctrine was that such intangible and impersonal beings, existing only in contemplation of law, and without intelligence and corporeal form, could be guilty of no wrong that implied an evil intent or malicious motive. But all this has been discarded for more than a half a century, and the rule now prevailing is that in respect of liability for the tortious acts of its controlling officers and agents there is no substantial difference between a corporation and a natural person, even in cases in which fraud or malicious intent in fact must be proved. While a corporation has no brain to contrive, no tongue to deceive, and no hands with which to strike, it employs in its service the brains and tongues and hands of others; and as it can only operate through natural persons, there is, as there logically should be, a correlative responsibility for the acts of those persons in the course of the corporate business and of their employment, and for any malicious and evil intent with which such acts are attended.

A few of the multitude of authorities will be sufficient to illustrate the wide range of the modern doctrine. Corporations have been held liable in these cases by attributing to them the conduct of their officers and agents: Assault and battery with a deadly weapon by a railroad company (Railway v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. Ed. 1146); libel by a railroad company (Railroad v. Quigley, 21 How. 202, 16 L. Ed. 73); fraud and deceit, assault and battery, malicious prosecution, nuisance, and libel (National Bank v. Graham, 100 U. S. 699, 702, 25 L. Ed. 750); fraud by a municipal corporation in reports of distilled spirits to revenue collector (Salt Lake City v.

Hollister, 118 U. S. 256, 6 Sup. Ct. 1055, 30 L. Ed. 176); fraud and deceit by a manufacturing company (Butler v. Watkins, 13 Wall. 457, 463, 20 L. Ed. 629); maintenance of a nuisance (Railroad v. Baptist Church, 108 U. S. 317, 2 Sup. Ct. 719, 27 L. Ed. 739); assault and battery by an express company (Southern Ex. Co. v. Platten, 36 C. C. A. 46, 93 Fed. 936); malicious prosecution by a manufacturing company (Copley v. Sewing Machine Co., 2 Woods, 494, Fed. Cas. No. 3213); boycotting by a corporation of which the members were mercantile firms (Hartnett v. Plumber's Supply Assn., 169 Mass. 229, 47 N. E. 1002, 38 L. R. A. 194); malicious prosecution by a savings bank (Reed v. Home Savings Bank, 130 Mass. 443, 39 Am. Rep. 468); false representations as to corporate stock by a manufacturing company (Dorsey Machine Co. v. McCaffrey, 139 Ind. 545, 38 N. E. 208, 47 Am. St. Rep. 290); false imprisonment by a national bank (Wachsmuth v. Nat. Bank, 96 Mich. 426, 56 N. W. 9, 21 L. R. A. 278); conspiracy between a bank through its president and a merchant to defraud those of whom latter purchased goods (Johnston Fife Hat Co. v. National Bank, 4 Okl. 17, 44 Pac. 192). It is also well settled that a corporation cannot escape liability upon a plea that the tortious acts were ultra vires. Railroad v. Quigley, 21 How. 202, 16 L. Ed. 73; Merchants' Bank v. State Bank, 10 Wall. 604, 645, 19 L. Ed. 1008; County of Calhoun v. Emigrant Company, 93 U. S. 124, 130; 23 L. Ed. 826; National Bank v. Graham, 100 U. S. 699, 702, 25 L. Ed. 750; Salt Lake City v. Hollister, 118 U. S. 256, 6 Sup. Ct. 1055, 30 L. Ed. 176; Railway v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. Ed. 146; Railway Co. v. Howard, 178 U. S. 153, 160, 20 Sup. Ct. 880, 44 L. Ed. 1015; Alexander v. Relfe, 74 Mo. 517; Zinc Carbonate Company v. First National Bank, 103 Wis. 125, 79 N. W. 229, 74 Am. St. Rep. 845.

But it is said that Wright should be denied relief because of the maxim "In pari delicto potior est conditio defendentis." It was an essential part of the scheme to defraud that the victim should be led on by degrees to place himself in such a position that he would be prevented from having recourse to the courts. And this defense, so contrived in advance, is now produced for recognition, and it is said that, the plaintiff being equally culpable with the conspirators, a court of justice should therefore leave him where it finds him. It must be admitted that when Wright left his home for Webb City he thought he was going to participate in an unlawful scheme to defraud others. But, after all, it amounted to nothing more than a mere belief on his part. That he was betting upon a foot race at Webb City was but a figment of his imagination. In reality there was no betting and no foot race, and it was not intended that there should be. It was all a pretense and a sham. He was merely a puppet, who was acting the will of the conspirators to his own undoing. The real design behind the scenes was one in which Wright did not participate except as the victim. If he was particeps criminis, it was to an offense against himself. Boatright and his associates sought Wright in his home, awakened in him a desire for wrongful gain that might other-

wise have remained dormant, inspired in his mind an unfounded idea that he was going to secure it, and then by fraud and false pretenses deprived him of his money. We are unable to agree with counsel that the victim was in equal wrong with those who despoiled him merely because, at their instance, and as a result of their wiles, he entertained a purpose which it was never intended he should consummate. To hold otherwise would be to accord too much weight to the unsubstantial, and to enable those whose active occupation was swindling to successfully avail themselves of the false position in which, as part of their predetermined scheme, they succeeded in placing others they intended to defraud. Courts of justice should not thus reward criminal ingenuity. This is not a case in which, two persons having conspired to rob an innocent third, one of the two robs the other. The pretended miners, who were members of the counterfeit athletic club, and against whose wealth Boatright falsely assumed to direct his designs, were in fact his criminal accomplices. They were confidence men, not miners. They, as well as the defendants, played their part in the scheme to defraud, the whole machinery of which was employed, not against themselves, but against their victim.

We are also of the opinion that, viewing the conduct of Wright in its most reprehensible light, nevertheless the interest and welfare of the public would be better subserved by causing the loss to fall upon those who aided and assisted in criminal practices followed as an occupation than by the punishment of the individual victim. It would be doubtful wisdom to extend encouragement to organizations of confidence men, who prey upon the public, by allowing them the use of the rule "in pari delicto" as a shield of defense, when a part of the scheme they employ is to place those they seek and then defraud in the position they rely on.

These conclusions are abundantly supported by authority. The rule which declares that when parties are in equal wrong the position of the defendant is the better, and that the courts will not allow their machinery to be used for the relief of one who has been defrauded in a corrupt or illegal transaction in which he participated, is based not upon statutory provisions, but upon general principles of public policy. It is therefore not for the sake of the defendant that the rule is enforced, but to promote the general good. And when the objection is urged by the defendant, or is suggested by the court of its own motion, two questions present themselves for consideration: Were the parties in equal wrong, or was there such fraud, deceit, oppression, or inequality as challenges the attention of a court of justice? If they appear to be in equal wrong, will nevertheless a wise regard for the general welfare be better subserved by the punishment of the defendant than by denial of relief to the complaining party? In 1 Story, Eq. Jur. § 300, it is said:

"And indeed in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto, for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, hardship, undue influence, or

great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense. And, besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be."

The same doctrine is recognized by Pomeroy:

"Even when the contracting parties are in pari delicto, the courts may interfere from motives of public policy. 'Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him.'" 2 Pomeroy Eq. Jur. § 941.

In Reynell v. Sprye, 1 De G. M. & G. 660, 679, it was said:

"But where the parties to a contract against public policy, or illegal, are not in pari delicto (and they are not always so), and where public policy is considered as advanced by allowing either, or, at least, the more excusable of the two, to sue for relief against the transaction, relief is given to him, as we know from various authorities, of which Osborne v. Williams, 18 Ves. 379, is one."

In Osborne v. Williams, 18 Ves. 379, there was an illegal contract between a father and son, by which the former obtained from the latter moneys paid him for public services. Sir William Grant, master of the rolls said:

"Courts both of law and equity have held that two parties may concur in an illegal act without being deemed to be in all respects in pari delicto. I consider this agreement as substantially the mere act of the father. He put up to sale a situation, which the young man would naturally be desirous of obtaining, and could obtain only upon the terms prescribed by his father."

To the same effect are Atkinson v. Denby, 6 H. & N. 778, 30 L. J. Ex. 361; Smith v. Cuff, 6 M. & Sel. 160; Morris v. M'Cullock, (2d Ed.) Amb. 432. In the note to this case others are cited in which relief was granted on ground of public policy though parties were in pari delicto. See, also, Goldsmith v. Bruning, 1 Eq. Ca. Ab. 89.

The precise questions now before us were presented upon similar facts to the Supreme Courts of Missouri and Arkansas. Hobbs v. Boatright, et al. (Mo. Sup.) 93 S. W. 934, and Lockman v. Cobb (Ark.) 91 S. W. 546. In the Hobbs Case the Missouri court affirmed a judgment against the Exchange Bank and Stewart, its cashier, upon evidence which is said by that court to be substantially the same as in the case now before us. Hobbs was one of the numerous victims of Boatright and his co-conspirators. Referring to the general rule, that court said that it "should not be applied in a case in which to withhold relief would to a greater extent offend public morals." And it put this question and answered it against the defendants:

"Will we promote good morals to say to this gang and their friends and abettors, you have so debauched and degraded your victim that the law will not touch him or hear his complaint; therefore you may go free, keep what you took from him, and look out for another victim?"

In the Arkansas case Cobb was defrauded by some of Boatright's active assistants, who seem to have engaged for the time being in business on their own account. The methods employed were like

those in the case at bar, and the same defense was urged against recovery. The Supreme Court of that state said:

"In what wrong or crime were the plaintiff and defendants in pari delicto? If any, it was a conspiracy by the defendants to defraud the plaintiff and to steal his money; to obtain by deceit and falsehood the money of plaintiff by inducing him to believe that a foot race was to be run, and that they were actually wagering their money, one against the other, upon it; and to induce him to believe he was betting upon a foot race. He did not participate in this conspiracy, and could not possibly have done so. * * * By fraud and deceit they caused him to make a pretended wager, and robbed him of his money, pretending that he had lost it. He might have intended to wager if he had the opportunity, but intention without any act to carry it into effect does not constitute a crime or a wrong, and he was not in pari delicto with the defendants."

In Hinsdill v. White, 34 Vt. 558, the defendant falsely and fraudulently represented to plaintiff that he had certain evidence that her son had burglarized his house, and by means thereof he induced her to pay him money for his agreement not to prosecute. Upon learning of the fraud, she sued to recover the money. The court said:

"The consideration and object of the contract and payment of the money were in contravention of law, and to this extent the parties were in equal fault; but the plaintiff was induced to enter into it and to pay the money by the false and fraudulent representations of the defendant. In such case are the parties to be regarded as in pari delicto, so that the law will regard them as equally reprehensible, and refuse to interfere?"

It was held:

"That when one has by fraudulent means induced another to pay him money, he cannot shield himself from paying it back by saying that both parties had an illegal end in view in the transaction."

That courts will take notice of the different degrees of culpability and act accordingly was recognized in Harrington v. Grant, 54 Vt. 236.

In Smith v. Blachley, 188 Pa. 550, 41 Atl. 619, 68 Am. St. Rep. 887, a physician who attended a girl during an illness represented to her father and a neighbor who had a son that the illness was due to a criminal operation; that a humane society, having learned of it, was about to institute a prosecution against the members of both families; that he could hush the matter up if they would give him $3,000 to hand to the agent of the society. After repeated urging, they gave him the money. Some years afterwards it was learned that all of his representations were false, and that he had pocketed the money. Suit was brought for its recovery. The contention now urged upon us found favor with the trial court. It said:

"They [the plaintiffs] cannot be heard to say that he committed a fraud upon them by failing to consummate an arrangement which was in itself a fraud upon the administration of justice. The plaintiffs are the parties, who, to maintain their action, are compelled to uncover and invoke the aid of the corrupt agreement. This being the case, they cannot profit by it, either directly, as the foundation of an action, or by using it to toll the statute."

But the Supreme Court of Pennsylvania said:

"It is argued that, even if no crime was actually committed by plaintiffs, yet there was an intent to commit one when they paid the money to Blachley, and hence, even if their agent defrauded them, they cannot recover it back. As we have noticed, the intended crime was an impossible one. When conduct susceptible of two constructions is proven, the intent often determines its criminality; but an intent not carried out by an act, or which is impossible of execution by an act, is not punishable. The law takes no cognizance of an intent existing only in the mind, nor does it impose, as a penalty for such intent, immunity to him who has plundered one guilty of it."

In Gorringe v. Read, 23 Utah, 120, 63 Pac. 902, 90 Am. St. Rep. 692, the court set aside a conveyance executed by a woman to prevent the prosecution of her husband as for a felony. He had stolen property of small value, and it was falsely represented to her that he had committed a penitentiary offense. It was said:

"It is no doubt true, as a general proposition, that a court of equity, acting on the maxim, 'In pari delicto potior est conditio defendentis et possidentis,' will not interpose to aid parties who are concerned in unlawful transactions or agreements; but where public policy requires relief to be given, and when the parties, though in delicto, are not in pari delicto—as when at the time of the transaction the complainant was under undue influence, hardship, oppression, or great inequality of condition or age existed, and acted involuntarily—the maxim does not apply."

In re Arnold (D. C.) 133 Fed. 789. In this case the bankrupts, by representing that they were engaged in conducting a racing stable, betting on races, etc., that they had exceptional facilities for making money by this means, and that their profits enabled them to pay large returns, secured from the public deposits of large sums of money to be used in their business. Among the depositors was the claimant. His claim was objected to on the ground that the business of the bankrupts was illegal, and he knew it. It was found, however, that many of the most material representations which induced the deposits were entirely false; that the racing was but an incidental feature of their scheme, and that they were really paying the pretended dividends out of the moneys deposited, and not out of profits made. It was contended that the bankrupts and the claimant were engaged in a gambling venture, and were in pari delicto. Judge Adams, now of this court, held that this view was altogether too superficial. He applied the doctrine announced by the Supreme Court of Vermont in Hinsdill v. White, supra, and allowed the claim.

In Catts v Phalen, 2 How. (U. S.) 376, 11 L. Ed. 306, the defendant was employed to draw numbers from a lottery wheel. He secretly employed an outsider to purchase a lottery ticket for him, and when the drawing came off he concealed in the cuff of his coat a false ticket, with numbers corresponding to those on the ticket purchased, and then, slipping it to his fingers, he pretended to have drawn it from the wheel. He received a prize of $12,500. Upon discovery of the fraud an action was brought to recover the money. The case was considered upon the assumption that a legislative act had declared the lottery business to be illegal, and that defense was asserted.

The Supreme Court held, however, that the money was paid to and received by the defendant on a false assertion of the fact that he had a ticket which was entitled to a prize; that the contract which the law raised between the parties was not founded on the drawing of the lottery, but on the obligation to refund the money, which had been received by falsehood and fraud, and by the assertion of a drawing which never took place. The court said that to state is to decide such a case, and it was held that the plaintiffs could recover. Many other authorities may be found in the opinion of the learned district judge before whom this case was tried. 130 Fed. 905.

The clear distinction between the relation of Wright, upon the one hand, and that of Boatright and his associates, upon the other, to the fraudulent transactions by which the former was deprived of his money is further illustrated by the aspect in which such transactions have been regarded by many of the courts. In accordance with their decisions, Boatright and his associates could have been charged with and convicted of the crime of larceny. It would seem anomalous if Wright were held to be particeps criminis to a larceny of his own money, and equally so if he were held to be in pari delicto with those who stole it. Conduct similar to that under consideration has been held to constitute larceny, even though the fraud or pretense practiced on the victim, and by which he was despoiled of his money, assumed the simulated form of a violation of the law, in which he participated. State v. Skilbrick, 25 Wash. 555, 66 Pac. 53, 87 Am. St. Rep. 784; Doss v. People, 158 Ill. 660, 41 N. E. 1093, 49 Am. St. Rep. 180; Crum v. State, 148 Ind. 401, 47 N. E. 833; Johnson v. State (Ark.) 88 S. W. 905; Loomis v. People, 67 N. Y. 322, 23 Am. Rep. 123; People v. Shaw, 57 Mich. 403, 24 N. W. 121, 58 Am. Rep. 372; People v. Shaughnessy, 110 Cal. 598, 43 Pac. 2; People v. De Graaf, 127 Cal. 676, 60 Pac. 429; Defrese v. State, 50 Tenn. 53, 8 Am. Rep. 1; Hall v. State, 65 Tenn. 522.

It is also contended that a recovery by Wright is precluded by the maxim "ex dolo malo non oritur actio." This contention is in part answered by the authorities already reviewed, and by what we have said concerning the character of the transaction and Wright's connection with it. We are of the opinion that the maxim has no pertinency to a case like that before us. Its meaning is that a court will not lend its aid to one who founds his action upon an immoral or illegal act, and the test of its applicability is whether the plaintiff can make out his case otherwise than through the medium and by the aid of such an act, to which he himself was a party. Must he have the aid of the illegal transaction in order to recover? Has he founded his action upon it? Is he seeking to recover the avails or the results thereof?

Sir George Jessel thus expressed the doctrine in Sykes v. Beadon, L. R. 11 Ch. Div. 170, 197:

"I think that the principle is clear that you cannot directly enforce an illegal contract, and you cannot ask the court to assist you in carrying it out. You cannot enforce it indirectly; that is, by claiming damages or

compensation for the breach of it, or contribution from the persons making the profits realized from it."

It seems to us quite obvious that this doctrine does not touch the case at bar. This action was not brought to enforce a corrupt or illegal contract, or to secure any of the fruits thereof. Wright does not so found the action. He does not ask the court to recognize the propriety of his transaction, or to award him any portion of the plunder. He proceeds, not in affirmance or reliance, but wholly by way of repudiation, and seeks merely a restoration of that which was illegally taken from him by fraud and false pretense. The rule which controls cases like the one at bar is the rule of the lottery ticket case (Catts v. Phalen, supra). It was also expressed by the Supreme Court in National Bank & Loan Co. v. Petrie, 189 U. S. 423, 23 Sup. Ct. 512, 47 L. Ed. 879, where, omitting the citations, it was said:

"The question then is, leaving on one side the averment just quoted from the answer, and assuming that the parties were attempting a transaction forbidden by the law, whether the nature of the attempt prevents one of them from withdrawing from the bargain on the ground of preliminary fraud. If the withdrawal were on the ground of repentance alone, the law might, or might not, leave the parties where it found them. But a person does not become an outlaw and lose all rights by doing an illegal act. The right not to be led by fraud to change one's situation is anterior to and independent of the contract. The fraud is a tort. Its usual consequence is that as between the parties the one who is defrauded has a right, if possible, to be restored to his former position. That right is not taken away because the consequence of its exercise will be the undoing of a forbidden deed. That is a consequence to which the law can have no objection, and the fraudulent party, who otherwise might have been allowed to disclaim any different obligation from that with which the other had been content, has lost his right to object because he has brought about the other's consent by wrong."

The court further observed: "Cases where the action is on the illegal contract do not apply." The transaction referred to in this case appears to have been completed, and not one in which one of the parties halted and repented during its progress. When attention is directed to the character of the cases in the Supreme Court which are relied upon to support the defense ex dolo malo, their inapplicability we think becomes apparent. In almost every instance the illegal bargain was the vehicle in which the plaintiff desired the court to move him to judgment. He founded his action upon it, and either directly or indirectly sought its enforcement. It is this that the Supreme Court holds cannot be done. These are the cases:

Hall v. Coppell, 7 Wall. 542, 19 L. Ed. 244. The action was for damages for the breach of a contract by which plaintiff, a British consul at New Orleans, agreed to protect from seizure and confiscation certain cotton then within the lines of the confederate forces, in consideration of a part of the profits when the cotton was sold. The plaintiff issued certificates falsely certifying the cotton was "the property of a British subject." The action was founded upon the contract, the parties to which "intended to delude and defraud the United States."

In Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539, there was a corrupt contract between the consul general of the Ottoman government at the port of New York, and an American company which manufactured arms that in consideration of an agreed commission the former should use his influence with a trusted agent of his government sent over to purchase arms to induce him to make the purchases of the company. The action was upon the contract to recover the commission.

In Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225, it was held that a broker who knowingly brings parties together for the purpose of wagering or gambling cannot recover for services or for losses incurred by himself.

In Embrey v. Jemison, 131 U. S. 336, 9 Sup. Ct. 776, 33 L. Ed. 172, the same rule was applied to a case in which such losses were the consideration of promissory notes.

In Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, the plaintiff, a quasi public corporation, sued to recover on a lease by which, without authority of law, it stripped itself of property, stipulated against the performance by it of its public duties, and abdicated its corporate functions. The action was in covenant on the instrument by which this was done.

Pullman's Palace Car Co. v. Central Transp. Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108, exhibits another phase of the controversy involved in the case last cited. In this case the lessor was allowed to recover from the lessee the value of the property delivered under the void lease, upon the principle that the right to a recovery of property transferred under an illegal contract is founded upon an implied promise to return or make compensation for it. The recovery was permitted, because it rested upon a disaffirmance instead of upon a reliance on the contract.

McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117, was a suit by one of the parties to an illegal contract founded in fraud, and its object was the recovery of profits, to which complainant claimed to be entitled under the contract. The character of this case is clearly illustrated by the language of the court:

"In the case before us the cause of action grows directly out of the illegal contract, and if the court distributes the profits it enforces the contract which is illegal."

In Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706, there was a bill in equity to restrain defendants from using an alleged trade-mark and for an accounting of profits. The doctrine of the case was concisely stated as follows:

"A court of equity will extend no aid to sustain a claim to a trade-mark or an article which is put forth with a misrepresentation to the public as to the manufacturer of the article, and as to the place where it is manufactured, both of which particulars were originally circumstances to guide the purchaser of the medicine."

In other words, complainant sought a court of equity to affirmatively perpetuate and enforce a fraud.

In Thomas v. City of Richmond, 12 Wall. 349, 20 L. Ed. 453, a city, without authority of law and against express statutory prohibition, issued bills to circulate as currency. It was held that an action would not lie on the bills or for money had and received. This doctrine is affected by considerations of public policy in respect of corporations and their powers.

In Harriman v. Northern Securities Co., 197 U. S. 244, 25 Sup. Ct. 493, 49 L. Ed. 739, the rule in pari delicto was applied, not the rule ex dolo malo, and it was noted that the parties may not be in equal wrong when there has been fraud or oppression on the part of the defendant.

Some other matters are presented by counsel but we find nothing in them sufficient to disturb the conclusion reached.

The judgment of the Circuit Court is affirmed.

SANBORN, Circuit Judge (dissenting). The plaintiff agreed with Boatright that for 20 per cent. of their winnings he would wager Boatright's money on a fake foot race, which Boatright agreed to make certain to result in their favor, so that they could thereby defraud the miners who bet against them out of their money. The plaintiff wagered large sums of money which he knew Boatright fraudulently furnished to him from the stakes and some of his own money in the performance of this corrupt agreement. Boatright broke his contract, and fixed the race against him. The plaintiff made and performed his part of his illegal contract to defraud others. He participated in the betting for this purpose. His intent and his acts were no less criminal and fatal to his case because they proved abortive. Rex v. De Berranger, 3 M. & S. 72.

The result of the opinion of the majority is that the plaintiff may recover because the gambling was fraudulent, because while the plaintiff was performing his agreement to cheat others by the fraudulent device of inducing them to bet upon the fake foot race they were engaged in a like endeavor to defraud him by the same device; an endeavor in which they succeeded while he failed. It is that one who is defrauded in gaming while he is engaged in an endeavor to defraud others thereby may recover the losses he sustains. The argument is that the plaintiff was induced by fraud to make his corrupt agreement, and to perform his part of it by betting upon a fraudulent race, and that he was not gaming because the result was certain. But the same argument holds good in every case of foul play, because in every such case the losing gambler is induced to bet upon a sure thing by the fraudulent representation that the play will be fair. If this argument be sound, and if the conclusion in this case illustrates the true rule, every gambler may recover in the courts the losses he sustains upon fixed races, marked cards, or foul plays upon the ground that in such cases there is no uncertainty in the result, while in cases in which the races and plays are fair he is remediless; and henceforth the courts must, as Judge Sherwood said in Kitchen v. Greenabaum, 61 Mo. 115, "sit as the

arbiters of the gaming table and the umpires of the prize ring," for they must hear the evidence upon and determine the issue in every losing gambler's case, whether the race or play was foul or fair, and give judgment for or against him accordingly. A rule and practice of this nature runs counter to my views of the law, to those of more eminent judges who have preceded me, and to the established rule that no cause of action lies for fraud which induces, or damage which results from, a contract or transaction which involves the moral turpitude of the plaintiff, or his violation of a general law of public policy.

In Babcock v. Thompson, 20 Mass. 446, 449, 15 Am. Dec. 235, this very question was considered and determined by the Supreme Court of Massachusetts. The plaintiff brought an action to recover from the defendant money lost in gaming by foul play. The court said, by the mouth of Chief Justice Parker:

"Here is a case of gaming accompanied with cheating. Clearly, if the gaming had been fair, the law would give no remedy. The only question then is, whether the fraud will alter the case. We think it will not. If a man thus voluntarily puts himself in a condition to be cheated, through his illegal act he cheats the government, and the other person cheats him, and they must be left to settle the affair between themselves."

In Abbe v. Marr, 14 Cal. 210, 212, the exact case before us was presented to the Supreme Court of California, which was then composed of Chief Justice Field, afterwards Mr. Justice Field of the Supreme Court, and Judges Baldwin and Cope. The members of a gang of swindlers, by false representations and promises that they had arranged to fix a horse race so that the plaintiffs' horse would surely win, induced them to bet their horses, cows, wood, and money on this race, and then they so fixed the race that the plaintiffs lost. They brought an action directly against the members of the gang to recover back their property. The court said:

"No court of justice can listen to such a case. When the plaintiff asserts his own turpitude in this way he sends his case out of court. If in attempting, by way of reprisal or otherwise, to swindle another be becomes the victim of his own arts, it may become a question in morals or in honor which party is more culpable. Courts of law entertain no discussion on the subject, but terminate the controversy by shutting their doors in the face of the intruder."

In Scott v. Brown & Co., L. T. R. (N. S. 1892) 782, the purchasers of shares of stock brought an action against their brokers to recover moneys they had paid for the shares, on the ground that the brokers had sold their own shares to them instead of buying shares for them in the market, and upon the trial the fact crept out that the plaintiffs had agreed that the brokers should buy the shares on the market at a premium to start the corporation and induce the public to buy at a high rate. The Court of Appeals held that the plaintiffs could not recover on account of the fraud which the brokers had committed upon the plaintiffs because the plaintiffs themselves had authorized the purchases for the purpose of cheating the public, and it quotes the declaration of Chief Justice Cockburn in Beghie v. Phosphate Sewage Co., L. R. 10 Q. B. 491, 499, that "the plaintiff

cannot recover back the money, on the well-established principle that money paid in futherance of a fraud or other unlawful purpose cannot be recovered back." The plaintiff paid his money here in furtherance of the fraud which he had agreed to perpetrate on the miners at Webb City, for the unlawful purpose of cheating them at gaming.

In Robeson v. French, 53 Mass. 24, 25, 45 Am. Dec. 236, the plaintiff brought an action to recover damages for fraud in a horse trade which was made on Sunday. The court denied a recovery, and said, after citing the statute which prohibited trading on that day: "In all such cases it is a well-established principle that a court will not lend its aid to a party who founds his action on an illegal transaction."

In Gregg v. Wyman, 58 Mass. 322, 325, an action for damages for the abuse of a horse let for driving for pleasure on Sunday failed upon the same ground.

In Myers v. Meinrath, 101 Mass. 366, 370, 3 Am. Rep. 368, the plaintiff sold and delivered to the defendant a chattel in exchange for another on Sunday. He subsequently returned the chattel he had received, and then brought an action of tort for the conversion of the chattel which the defendant had retained. The court said that the plaintiff contended that he was entitled to recover because his rights did not depend at all upon the illegal transaction, and it answered:

"But the illegality lies directly in the course of events which placed the property in the hands of the defendant, and made it necessary for the plaintiff to resort to this suit to regain it. It is inseparably connected with the origin of the cause of action, and it is immaterial which party discloses it to the court. Gregg v. Wyman, 4 Cush. (Mass.) 322; Duffy v. Gorman, 10 Cush. (Mass.) 45. The ends of justice are found to be best secured by permitting it to be thus administered upon one of two offending parties at the instigation of the other," and a recovery was denied.

In Haynes v. Rudd, 102 N. Y. 372, 376, 7 N. E. 287, 55 Am. Rep. 815, the maker of a note brought an action against the payee to recover from him the amount which the maker had been obliged to pay to a bona fide holder of the note, which the defendant had induced him by threats and the inspiration of fear to make to compound a felony. The court refused to permit a recovery and said:

"While fraud, duress, and undue influence employed in procuring a contract for the payment of money may vitiate and destroy the obligation created, and render it of no effect, and the party who has been compelled to pay money on account thereof may maintain an action to recover the same, such a right does not exist and cannot be enforced where the consideration of the contract thus made arises entirely upon, or is in any way affected by, the compounding of a felony."

Nor does such a right exist when the object of the fraud is to induce the victim to make and perform a contract to defraud others, or to conduct an illegal transaction in gaming, because he can do neither without himself violating the moral and the civil law, and shutting the doors of the courts against him. This conclusion is further sustained by the following rules of law and decisions of the courts.

1. Ex dolo malo non oritur actio. It is the settled public policy of the United States that its courts shall sustain no action, whether in

tort or on contract, which arises out of the moral turpitude of the plaintiff, or from his violation of a general law of public policy, because the maintenance of such actions promotes violations of the moral law and of the civil law by inspiring the belief that one may safely violate both, since if he loses the courts will make him whole. This rule is not conditioned nor limited by the maxim, "In pari delicto potior est conditio defendentis," nor by any requirement that the guilt of the plaintiff must be equal to that of the defendant. Such a limitation would destroy the rule, because the cases are rare, perhaps none ever arises, in which the intelligence, knowledge, and situations of the parties are such that their guilt is equal. Hall v. Coppell, 7 Wall. 552, 547, 558, 19 L. Ed. 244; Thomas v. Richmond, 12 Wall. 349, 355, 20 L. Ed. 453; Oscanyan v. Arms Co., 103 U. S. 261, 269, 26 L. Ed. 539; Irwin v. Williar, 110 U. S. 499, 510, 4 Sup. Ct. 160, 28 L. Ed. 225; Embrey v. Jemison, 131 U. S. 336, 345, 9 Sup. Ct. 776, 33 L. Ed. 172; Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 60, 11 Sup. Ct. 478, 35 L. Ed. 55; Pullman's Car Co. v. Transportation Co., 171 U. S. 138, 151, 18 Sup. Ct. 808, 43 L. Ed. 108; McMullen v. Hoffman, 174 U. S. 639, 654, 658, 19 Sup. Ct. 839, 43 L. Ed. 1117; Harriman v. Northern Securities Co., 197 U. S. 244, 295, 25 Sup. Ct. 493, 49 L. Ed. 739; Babcock v. Thompson, 20 Mass. 446, 449, 15 Am. Dec. 235; Myers v. Meinrath, 101 Mass. 366, 370, 3 Am. Rep. 368; Inhabitants of Worcester v. Eaton, 11 Mass. 368, 377; Robeson v. French, 53 Mass. 24, 25, 45 Am. Dec. 236; Duffy v. Gorman, 64 Mass. 45; Frost v. Cage, 85 Mass. 560, 562; Gregg v. Wyman, 58 Mass. 322, 324, 326, 327; Pattee v. Greely, 13 Metc. 284, 287; Holman v. Johnson, 1 Cowp. 341, 343, 344; Taylor v. Chester, L. R. 4 Q. B. 314, 315; Begbie v. Phosphate Sewage Co., 10 L. R. Q. B. (1875) 491, 499; Scott v. Brown & Co., L. T. R. (N. S. 1892) 782; Chicago, etc., R. Co. v. Wabash, etc., R. Co., 9 C. C. A. 659, 61 Fed. 993; Miller v. Marckle, 21 Ill. 151; Shaffner v. Pinchback (Ill.) 24 N. E. 867, 868, 23 Am. St. Rep. 624; Bryant v. Wilcox (Mich.) 100 N. W. 918, 919, 920; Knight v. Linzey, 80 Mich. 396, 45 N. W. 337, 339; Morgan v. Groff, 5 Denio (N. Y.) 364, 365, 49 Am. Dec. 273; Haynes v. Rudd, 102 N. Y. 372, 376, 377, 7 N. E. 287, 55 Am., Rep. 815; Morrison v. Bennett (Mont.) 52 Pac. 553, 40 L. R. A. 158; Lyon v. Strong, 6 Vt. 219; Shipley v. Reasoner, 80 Iowa, 548, 552, 45 N. W. 1077; Kitchen v. Greenabaum, 61 Mo. 110, 115; Williamson v. Baley, 78 Mo. 636, 638; Sprague v. Rooney, 104 Mo. 349, 358, 16 S. W. 505; Haggerty v. Storage Co., 143 Mo. 238, 247, 44 S. W. 1114, 40 L. R. A. 151, 65 Am. St. Rep. 647; Green v. Corrigan, 87 Mo. 359; Tyler v. Larimore, 19 Mo. App. 445, 458; Clark on Contracts, § 213.

2. The maintenance of actions to recover moneys or property lost or damages sustained through transactions or contracts wherein the plaintiffs are guilty of moral turpitude or of the violation of a general law of public policy is as imperatively prohibited by the foregoing rule as the maintenance of actions to enforce contracts of that nature. Thomas v. Richmond, 12 Wall. 349, 355, 20 L. Ed. 453;

Irwin v. Williar, 110 U. S. 499, 510, 4 Sup. Ct. 160, 28 L. Ed. 225; Begbie v. Phosphate Sewage Co., L. R. 10 Q. B. 491, 499; Scott v. Brown & Co., L. T. R. (N. S. 1892) 782; Babcock v. Thompson, 20 Mass. 446, 449, 15 Am. Dec. 235; Abbe v. Marr, 14 Cal. 210, 212; Knight v. Linzey, 80 Mich. 396, 45 N. W. 337, 339, 8 L. R. A. 476; Morgan v. Groff, 5 Denio (N. Y.) 364, 365, 49 Am. Dec. 273; Myers v. Meinrath, 101 Mass. 366, 370, 3 Am. Rep. 368; Haynes v. Rudd, 102 N. Y. 372, 376, 377, 7 N. E. 287, 55 Am. Rep. 815; Bryant v. Wilcox (Mich.) 100 N. W. 919, 920; Shaffner v. Pinchback (Ill.) 24 N. E. 866, 868, 23 Am. St. Rep. 624; Inhabitants of Worcester v. Eaton, 11 Mass. 366, 377; Shipley v. Reasoner, 80 Iowa, 548, 558, 45 N. W. 1077; Robeson v. French, 53 Mass. 24, 25, 45 Am. Dec. 236; Lyon v. Strong, 6 Vt. 219; Duffy v. Gorman, 64 Mass. 45.

3. No action lies for fraudulently inducing one to engage knowingly, or for damages resulting while one is knowingly engaged, in a contract or transaction which involves his own moral turpitude and his violation of general laws of public policy, because his own wrong and his violation of law repel him from the courts. Haynes v. Rudd, 102 N. Y. 372, 376, 377, 7 N. E. 287, 55 Am. Rep. 815; Babcock v. Thompson, 20 Mass. 446, 449, 15 Am. Dec. 235; Abbe v. Marr, 14 Cal. 210, 212; Scott v. Brown & Co., L. T. R. (N. S. 1892) 782; Begbie v. Phosphate Sewage Co., L. R. 10 Q. B. 491, 499; Robeson v. French, 53 Mass. 24, 25, 45 Am. Dec. 236; Gregg v. Wyman, 58 Mass. 322, 325; Duffy v. Gorman, 64 Mass. 45.

4. The maxim, "In pari delicto potior est conditio defendentis" is but a corollary to the general rule "Ex dolo malo non oritur actio," and it neither limits nor controls it. But if the act or contract from which one's cause of action springs be in itself immoral, or a violation of the general laws of public policy, he is in pari delicto, within the proper interpretation of this maxim, although his guilt may be incomparably less than that of the defendant. Thomas v. Richmond, 12 Wall. 349, 355, 20 L. Ed. 453; Smith v. Bromley, 2 Doug. 696, note; Harriman v. Northern Securities Co., 197 U. S. 244, 295, 25 Sup. Ct. 493, 49 L. Ed. 739, and authorities cited under rule 1. The test which determines whether or not a plaintiff is in pari delicto, within the true meaning of this maxim, is not whether his guilt is equal to that of the defendant, but whether or not the whole transaction upon which his case is founded can be portrayed to the court without disclosing his moral turpitude or his violation of a general law of public policy. Taylor v. Chester, L. R. 4 Q. B. 314, 315; Simpson v. Bloss, 7 Taunt. 256; Gregg v. Wyman, 58 Mass. 322, 326, and authorities there cited.

The rule of law which governs this case is one of public policy. All agree that the highest and broadest public policy forbids relief to the plaintiff, or the punishment of the defendants by the maintenance of a baseless action, in violation of any settled public policy of the nation evidenced by the uniform decisions of its Supreme Court. The opinion of the majority, however, is that it is the public policy of this nation to sustain actions arising out of contracts and transactions wherein the plaintiffs have been guilty of moral

turpitude and of violation of general laws of public policy, such as those against gaming, unless the guilt of the plaintiffs is equal to that of the defendants, and even then whenever the judges who happen to try any particular case are of the opinion that the general welfare will be better subserved by the punishment of the defendant than by the denial of relief to the complaining party.

Public policy is not to be determined by the views which particular judges may entertain of the interests of the people, nor by general considerations tending to show what policy would probably be wise or unwise, because such a standard of determination might be unconsciously varied by the personal views of the judges who happen to constitute the court in each particular case. The public policy of the nation may be determined only by its Constitution, laws, and judicial decisions. Vidal v. Girard's Exr's, 2 How. 127, 197, 11 L. Ed. 205; Swann v. Swann (C. C.) 21 Fed. 299, 301; U. S. v. Freight Ass'n, 166 U. S. 340, 17 Sup. Ct. 540, 41 L. Ed. 1007; Hartford Fire Ins. Co., v. Chicago, Milwaukee & St. Paul Ry. Co., 70 Fed. 201, 202, 17 C. C. A. 62, 63, 30 L. R. A. 193; Daniels v. Benedict, 97 Fed. 367, 372, 38 C. C. A. 592, 597.

Nor is the question here one of the public policy of the state of Missouri. This is an action between citizens of different states. It involves a question of general law, the public policy of the nation regarding the maintenance in its courts of actions for damages resulting from transactions wherein the plaintiffs are guilty of moral turpitude, as was the plaintiff in this case in making and performing his part of the agreement to defraud his associates by betting upon a fraudulent foot race. Hartford Fire Ins. Co. v. Chicago, Milwaukee & St. Paul Ry. Co., 70 Fed. 201, 202, 17 C. C. A. 62, 63, 30 L. R. A. 193. Moreover, the state of Missouri has no settled public policy upon this question.

In Kitchen v. Greenabaum, 61 Mo. 110, 115, the Supreme Court of Missouri adopted and enforced the rules stated in this opinion. In that case the defendant by fraudulent concealment and false representations had induced the plaintiff to sell him a lottery ticket which had drawn a prize of $600 for the paltry sum of $10, and the court refused to sustain an action on his part for the recovery of the $600 which the defendant had collected on the ticket. Here was a mere violation of a general law of public policy. Here the guilt of the plaintiff was incomparably less than that of the defendant, because he had participated in no fraud, and yet the court denied a recovery. The rule thus established was followed by the Supreme Court of that state in Williamson v. Baley, 78 Mo. 636, 638; Green v. Corrigan, 87 Mo. 359; Sprague v. Rooney, 104 Mo. 358, 16 S. W. 505; and Haggerty v. Storage Co., 143 Mo. 247, 44 S. W. 1114, 40 L. R. A. 151, 65 Am. St. Rep. 647. But in the late case of Hobbs v. Boatright (Mo. Sup.) 93 S. W. 934, wherein that court followed the judgment below, it repudiated these rules, and abandoned the salutary public policy they evidence. There is, therefore, no settled public policy upon this question in the state of Missouri.

We turn, therefore, to the decisions in England which have been adopted in this country, and to the decisions of the Supreme Court and to those of other courts whose opinions are in accord with them, to learn the public policy of the nation upon this subject.

In Holman v. Johnson, 1 Cowp. 343, Lord Mansfield declared the public policy which has ever prevailed in England in memorable words, which have been adopted by repeated decisions of the Supreme Court of the United States in cases which have involved this question. He said:

"The objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: 'Ex dolo malo non oritur actio." No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it: for where both are equally in fault, potior est conditio defendentis."

It will be noticed that the basis of this rule is not the equality of the guilt of the parties to the action. The remark upon that subject presents the maxim "In pari delicto potior est conditio defendentis" as a mere corollary to the fundamental rule. By the terms of the statement of Lord Mansfield it neither conditions nor controls that rule. The rule is that the courts will not aid a plaintiff to maintain an action which arises out of his moral turpitude and the violation of a general law of public policy if his act or contract is stained with wrong, although his guilt may be less than that of the defendant, and the reason for it is that the maintenance of such actions necessarily promotes violations of both the moral and the civil law. It leads men to lay the flattering unction to their souls that they may safely violate the laws of both God and man because if they lose thereby the courts will fully indemnify them. This rule of public policy has been adopted and steadily maintained by the uniform decisions of the Supreme Court. See the cases cited under rule 1, supra.

In Hall v. Coppell, 7 Wall. 558, 19 L. Ed. 244, the plaintiff, who while British vice consul had undertaken to protect cotton in the confederate lines for certain commissions, brought an action to recover them, and asserted that the illegality of the transaction had been waived by a reconvention. The Supreme Court said:

"The maxim, 'Ex dolo malo non oritur actio' is limited by no such qualification. The proposition to the contrary strikes us as hardly worthy of serious refutation. Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice

of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."

Note that the court did not stop to inquire whether the guilt of the plaintiff was equal to that of the defendant, but declared that "wherever the contamination reaches, it destroys." This was an action to enforce a contract in violation of a general law of public policy. But the rule applies with equal force to actions to rescind or repudiate a contract to recover money paid or property delivered, or to recover damages which arise out of a plaintiff's immoral act or his act violative of a general law of public policy.

In Thomas v. Richmond, 12 Wall, 349, 355, 20 L. Ed. 453, the city of Richmond had issued notes in small amounts to circulate as currency without authority so to do and in violation of the general public policy of the state of Virginia. The city had received the money therefor, and the plaintiff had purchased the notes. He brought an action in assumpsit and also on the common money counts for money had and received. His counsel contended that, although the notes themselves were void, the city received the money therefor, and ought not in conscience to retain it, and that therefore the action for money had and received could be maintained. The city had conceived and executed the unlawful scheme of making and issuing the notes and receiving the money therefor. The plaintiff was incomparably less guilty than the defendant, because he had done nothing but purchase the notes in the ordinary course of his business. But he failed to recover, and to the proposition that he was not in pari delicto the Supreme Court said:

"Lord Mansfield, in Smith v. Bromley, as long ago as 1760, laid down the doctrine, which has ever since been followed, in these words: 'If the act be in itself immoral, or a violation of the general laws of public policy, both parties are in pari delicto; but where the law violated is calculated for the protection of the subject against oppression, extortion, and deceit, and the defendant takes advantage of the plaintiff's condition or situation, then the plaintiff shall recover'" (page 355).

The Supreme Court, so far as the decisions cited or discovered indicate, has never departed from this rule.

There are two cases in which the plaintiffs had been guilty of no moral turpitude and had violated no general law of public policy wherein they were permitted to recover the value of the property they had delivered to corporations under contracts that were simply beyond the powers of those corporations. These cases are Spring Co. v. Knowlton, 103 U. S. 49, 26 L. Ed. 347, where the plaintiff recovered back an installment of 20 per cent. of the par value of stock which he had agreed to take, but which the corporation had no lawful authority to issue and did not issue, and Pullman's Car Co. v. Transportation Co., 171 U. S. 138, 151, 18 Sup. Ct. 808, 43 L. Ed. 108, in which the transportation company was permitted to recover the value of property which it had delivered under a contract beyond the powers of the corporation. But in each of these cases the Supreme

Court was careful to reiterate the fundamental rule, and to declare that it would not be disregarded and its full effect would not be minimized. In the former case it said:

"It is to be observed that the making of the illegal contract [the contract of subscription] was malum prohibitum and not malum in se. There is no moral turpitude in such a contract, nor is it of itself fraudulent, however much it may afford facilities for fraud."

And in the latter case it quoted the first part of the declaration of Lord Mansfield in Holman v. Johnson, which closes with the words:

"The principle of public policy is this: 'Ex dolo malo non oritur actio.' No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act,"

—cited numerous authorities, and then said:

"They are substantially unanimous in expressing the view that in no way and through no channels, directly or indirectly, will the courts allow an action to be maintained for the recovery of property delivered under an illegal contract, where in order to maintain such recovery it is necessary to have recourse to that contract. The right of recovery must rest upon a disaffirmance of the contract, and it is permitted only because of the desire of courts to do justice as far as possible to the party who has made payment or delivered property under a void agreement, and which in justice he ought to recover. But courts will not in such endeavor permit any recovery which will weaken the rule founded upon the principles of public policy already noticed." Page 151.

The case of Catts v. Phalen, 2 How. 376, 11 L. Ed. 306, cited by the majority, rests upon the defendant's false representation that he had drawn a prize ticket when he had not, and upon the fact that the plaintiffs had no need to disclose their acts, if any, in violation of the statute against lotteries in order to sustain their action. They abandoned all the other counts in their complaint, and recovered upon the count for money had and received upon the sole ground that they had been induced to pay out their money long after the lottery had been drawn by the false representation of the defendant that he had drawn out the prize ticket. This case was decided in 1844, and if it has any further or different significance it has been overruled long since by the decisions of the Supreme Court which are here cited.

In Irwin v. Williar, 110 U. S. 499, 510, 4 Sup. Ct. 160, 28 L. Ed. 225, and Embrey v. Jemison, 131 U. S. 336, 345, 9 Sup. Ct. 776, 33 L. Ed. 172, brokers had brought actions against their principals to recover losses which they had sustained and commissions which they had earned from their purchases by direction of their principals of contracts for the future delivery of commodities which the principals intended to settle by the payment of differences between the contract prices and the market prices without the delivery of the goods. The illegal intent which alone made these purchases unlawful rested in the minds of the purchasers. The brokers could not have made them illegal by their intent, so that the guilt of the purchasers was incomparably greater than that of the brokers. But in answer to the

thought that the guilt of the brokers was unequal to that of their principals, the Supreme Court said in the former case:

"It is certainly true that a broker might negotiate such a contract without being privy to the illegal intent of the principal parties to it which renders it void, and in such a case, being innocent of any violation of law, and not suing to enforce an unlawful contract, has a meritorious ground for the recovery of compensation for services and advances. But we are also of the opinion that when the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is particeps criminis, and cannot recover for services rendered or losses incurred by himself on behalf of either in forwarding the transaction."

In Harriman v. Northern Securities Co., 197 U. S. 244, 295, 25 Sup. Ct. 493, 49 L. Ed. 739, the complainants, the holders of the minority of the stock of a corporation, had been driven by a dominant majority to exchange their holdings for the stock of an illegal holding company, and the court held that they could not rescind or disregard the unlawful transaction, and recover back their original stock, although they were clearly far less guilty than the majority, who conceived and forced the execution of the illegal scheme.

In McMullen v. Hoffman, 174 U. S. 639, 654, 19 Sup. Ct. 839, 43 L. Ed. 1117, the court again reviewed the authorities at length, and refused to sustain an action by a partner for his share of the profits of an executed contract secured by the suppression of competition, in effect overruled the case of Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732, and said:

"There are several old and very familiar maxims of the common law which formulate the result of that law in regard to illegal contracts. They are cited in all law books upon the subject, and are known to all of us. They mean substantially the same thing, and are founded upon the same principles and reasoning. They are: 'Ex dolo malo non oritur actio;' 'Ex pacto illicito non oritur actio;' 'Ex turpi causa non oritur actio.' * * * The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is 'Potior est conditio defendentis'" (page 654).

—and it quotes with approval the words of Eyre, Chief Justice, in Farmer v. Russell, 1 Bos. & P. 296, a case in which an action was brought against the carrier to recover the moneys which he had collected for the delivery of counterfeit coin, wherein he said:

"However, I incline to a new trial on another ground. It does not clearly appear that the defendant was not himself a party to the original contract, for there was a circumstance in the report which gave much countenance to the idea that the carrier knew what he was doing, viz., that he was lending his assistance to an infamous traffic. In that case, the rule 'Melior est conditio possidentis' will apply; for if the contract with him be stained by anything illegal, the plaintiff shall not be heard in a court of law."

These repeated opinions of the highest judicial tribunal of the nation and the decisions of the English and of the state courts in accord

with them, which have been cited above under the rules which they sustain, are more persuasive to my mind of the public policy of this nation regarding the maintenance of actions in its courts than the decisions of state and other inferior courts that are in conflict with them, the general statements of Story and Pomeroy respecting the application of the maxim "In pari delicto" in suits in equity, the decision In re Arnold (D. C.) 133 Fed. 789, which involved no moral turpitude of the claimant, the opinion of the Supreme Court of Missouri in Hobbs v. Boatright, which merely follows the decision under review, or the opinion of the Supreme Court of Arkansas to the same effect. Moreover, Story, at section 303 of his Equity Jurisprudence, says:

"In. regard to gaming contracts, it would follow, a fortiori, that courts of equity ought not to interfere in their favor, but ought to afford aid to suppress them, since they are not only prohibited by statute, but may justly be pronounced to be immoral, as the practice tends to idleness, dissipation, and the ruin of families."

Pomeroy says at section 938:

"In gaming contracts, unlike usurious loans, it cannot be said that one party takes advantage of the necessities of the other, who is in vinculis; both act freely, and are in pari delicto. The general maxims therefore apply."

Further, the maxim of equity analogous to the principle which governs this case is not "In pari delicto potior est conditio defendentis," but "He who comes into a court of equity must come with clean hands," and "He who has done iniquity cannot have equity." A court of equity repels from its precincts remediless the complainant who has been guilty of bad faith, fraud, or any unconscionable act in the transaction which forms the basis of his suit. 1 Pomeroy, Eq. Jur. pars. 397, 398, 400; Medicine Co. v. Wood, 108 U. S. 218, 227, 2 Sup. Ct. 436, 27 L. Ed. 706; Marble Co. v. Ripely, 10 Wall. 339, 357, 19 L. Ed. 955; Michigan Pipe Co. v. Fremont Ditch, etc., Co., 49 C. C. A. 324, 327, 111 Fed. 284, 287. "If a contract has been entered into through fraud, or to accomplish any fraudulent purpose, a court of equity will not, at the suit of one of the fraudulent parties—a particeps doli—while the agreement is still executory, either compel its execution or decree its cancellation, nor after it has been executed, set it aside, and thus restore the plaintiff to the property or other interests which he had fraudulently transferred." 1 Pomeroy, Eq. Jur. par. 401.

If the decisions of the Supreme Court have not been misapprehended, they evidence a uniform and established public policy of the nation to refuse to maintain in its courts any action which is founded in a plaintiff's immoral contract or act, or in his contract or act violative of a general law of public policy. This rule of public policy is not conditioned or limited by any inquiry into the equality of the guilt of the plaintiff and the defendant. It applies wherever the plaintiff is particeps criminis, whatever the degree of his guilt. It forbids the maintenance of actions to repudiate or rescind corrupt

contracts and transactions and to recover the money lost in their performance as imperatively as actions to enforce them. The plaintiff's cause of action is founded in his own moral turpitude in making and performing his part of the agreement to defraud his associate gamblers, and in a violation of the general laws of public policy against gambling, and it ought not to be maintained in a court of the United States. Its maintenance is controlled and forbidden by the principle, "Ex dolo malo non oritur actio." It is not governed or permitted by the maxim, "In pari delicto est conditio defendentis."

If, however, the view heretofore presented were mistaken and if the maxim "In pari delicto" could be lawfully applied to the decision of this case, it would still seem to me that there was no right of recovery in the plaintiff: (1) Because his contract and act to defraud the miners were immoral, and his betting was violative of a general law of public policy, and these facts place him in pari delicto, within the legal meaning of this maxim. Thomas v. Richmond, 12 Wall. 349, 355, 20 L. Ed. 453. (2) Because evidence of his acts of moral wrong and violation of a general law of public policy is essential to a proof of his cause of action, and this fact places him in pari delicto. Taylor v. Chester, L. R. 4 Q. B. 314, 315; Gregg v. Wyman, 58 Mass. 322, 326, and cases there cited. (3) Because if the court is to sit to determine whether the plaintiff or the defendants were the more guilty, the evidence appears to me to fix the heavier burden upon the former. The question is not whether the guilt of the members of the Buckfoot gang was equal to that of the plaintiff, but whether the guilt of the plaintiff was equal to that of these defendants.

The facts of other cases, the wickedness of the Buckfoot gang, and the acquaintance of the defendants with their general reputation and practices, should not be permitted to conceal the real nature of this case nor the facts it presents. It is an action of conversion by an ex-deputy sheriff of Texas, who participated in the betting, against a bank, its cashier and president, who took no part therein, to recover of them $5,100 which the plaintiff lost, not to the defendants, but to the members of the gang, while he was performing his part of his corrupt agreement with Boatright to defraud them. All that the defendants ever had to do with this case was that the plaintiff deposited in the bank money he had received from Boatright and drafts on his local bank. The defendant bank cashed the drafts, and paid over to him their proceeds and the money he had deposited with it, and, after the plaintiff had made his agreement with Boatright, and after he knew that he was a perfidious swindler, the cashier, in answer to his suggestion to that effect, said that Boatright was all right. The plaintiff was a man of years, intelligence, and experience, when, in his own home in Texas, free from all inequalities of place or of fortune, of all threats and of all undue influence, a stranger (one of the Buckfoot gang) came to him, informed him that if he would go to Webb City, Mo., show that he had financial standing, and bet the money of Boatright under the false pretense that it was his own, on a race that Boatright had so fixed that it would surely result in his favor, and

would thereby induce the miners, who were Boatright's associates and the members of his club, to be defrauded out of their money by matching his bets, Boatright would give him 20 per cent. of the winnings they should thus fraudulently secure. The plaintiff procured a letter of credit from his local bank for $5,000, went to Webb City, met Boatright, and agreed with him to do this thing. In performance of this agreement Boatright gave him $3,300, and told him to match a bet on the race with one Ellis. The plaintiff deposited this $3,300 in the defendant bank for the purpose of making a false pretense that he was betting his own money, and exhibited to the bank his letter of credit. He went to the club room, bet $5,000 with Ellis on the footrace, and put up $2,500 as a forfeit in the hands of Boatright as a stakeholder. The latter then gave him $4,000 of the stake money secretly, and he drew out of the bank on his letter of credit $1,000 of his own money, and bet the entire $5,000 as his own. These proceedings concluded the operations of his first day in performance of his corrupt agreement. He retired in the consciousness of duty done, considered, but was not content. He returned to the club next day. Boatright gave him $4,000 more out of the stake money and he drew $4,000 of his own money, wagered it all, $100 more that he had in his pocket, and his watch, upon this race, and then asked Boatright to give him more money to bet. It was not until the latter refused this last request that he sought to withdraw his money from the stakeholder, but he nevertheless proceeded to the grounds, and held one end of the string while the race was run. His racer fell and lost. Now, the plaintiff engaged in unlawful betting in violation of a general law of public policy. The defendants did not. The plaintiff made and performed his part of a corrupt contract to defraud his gambling associates, and thereby engaged in a contract and transaction which were both mala in se and mala prohibita. The defendants made no such contract. They engaged in no such transaction. They did nothing in this case but to inform the plaintiff that Boatright was all right when he knew that he was not, and to pay him his money on his drafts in the regular course of a banking business. In this state of the case, the guilt of the plaintiff in this transaction appears to me to be incomparably greater than that of the defendants, and it does not seem to me that he acted under such circumstances of oppression, hardship, undue influence, or great inequality of condition or age as would bring his case under the exception to the rule in pari delicto upon which the majority rely.

The principles, rules, and authorities to which reference has now been made have forced my mind to the conclusion that the plaintiff is entitled to no relief at the hands of the courts of the United States in this case because he was guilty of the moral turpitude of making and performing his part of his contract with Boatright to defraud the miners by a fixed foot race, and because he was guilty by his betting of violating a general law of public policy, and this contract and act constitute an inseparable part of his cause of action, because it was in the performance of them that he lost his money.

There is another reason why the judgment below should be reversed. This is not an action for money had and received. The defendants have none of the money or property of the plaintiff. It is an action for damages for wrongful acts of the defendants. The only acts they performed in this case which could in any way have caused the plaintiff to lose his money were the statement of the cashier that Boatright was all right and the cashing of the drafts of the plaintiff upon his local bank. The plaintiff can recover nothing for the statement concerning Boatright, because he knew when it was made that it was false and that Boatright was a faithless rascal. He had made a contract with him to share the profits of the swindle he had agreed to perpetrate. He was not injured by that statement. The defendants violated no duty they owed to the plaintiff by cashing his drafts drawn upon his letter of credit from his local bank. The plaintiff had a right to draw his money from his local bank. If he had brought an action against that bank to recover the $5,000 which he had on deposit there, it would have been no defense to that action that he intended to bet his money on a fixed foot race, that he was sure to lose it, and that the bank knew it. No court would listen to such a defense. The defendants cannot be lawfully cast in damages for assisting the plaintiff to draw his money from the bank when they did nothing which a court would not have done in the face of a defense that the bank knew that he was about to lose the money on a fraudulent game. A plaintiff may recover the purchase price of goods which he sells and delivers to a defendant when he knows that the latter is to use them for an unlawful purpose. Holman v. Johnson, 1 Cowp. 341; Tracy v. Talmage, 14 N. Y. 162, 170, 67 Am. Dec. 132; Graves v. Johnson, 179 Mass. 53, 58; 60 N. E. 383, 88 Am. St. Rep. 55; Anheuser-Busch Brewing Ass'n v. Mason, 44 Minn. 318, 321, 46 N. W. 558, 9 L. R. A. 506, 20 Am. St. Rep. 580. And the bank cannot be legally liable for damages which result to a customer from his own folly in violating the moral and the civil law because it assists him by a lawful act to procure money which he is lawfully entitled to obtain, although it divines or knows that he is about to lose it in a transaction in which it takes no part and from which it receives no benefit.

In my opinion, the judgment against the bank and its officers is wrong, and it should be reversed.