[No. 18495.   Department One.   May 13, 1924.]

JOHN E. JORGENSEN, *Respondent*, v. CHAS. ALBERTSON
et al., *Appellants.*[1]

BANKS AND BANKING (14)—WRONGFUL ACTS OF OFFICERS—LIA-
BILITY FOR FRAUDULENT REPRESENTATIONS. A complaint alleging mis-
representation by bank officers as to the financial condition of a
company it was financing knowing that they were false and inducing
the giving of credit, states a good cause of action for fraud and
deceit against the bank and the officers.

FRAUD (8, 22)—INTENT AND KNOWLEDGE—EVIDENCE—SUFFICIENCY.
The evidence fails to show actionable fraud and deceit in a bank
officer's representations as to the financial standing of a company
whose contracts it was financing, where there was no proof of
*scienter* and they had good reason to believe that the concern was
honest and reliable and solvent.

Appeal from a judgment of the superior court for
Grays Harbor county, Sheeks, J., entered February 3,
1923, upon the verdict of a jury rendered in favor of
the plaintiff, in an action for fraud.   Reversed.

*E. E. Boner* and *Chadwick, McMicken, Ramsey &
Rupp,* for appellants.

*A. Emerson Cross,* for respondent.

HOLCOMB, J.—In this action to recover damages for
deceit and fraudulent representations concerning the
solvency of the Bell Motor Company, and the honesty,
solvency, and integrity of one D. B. Bell, in the sum of
$3,409.22, the jury rendered a verdict for one-half that
amount, upon which judgment was rendered.

The allegations as to deceit and fraud are these:

"III.

"That in the month of November, 1920, there existed
in Aberdeen, Wash. a concern known as the Bell Motor
Company, whereof one D. B. Bell was the manager and

[1]Reported in 225 Pac. 639.

reputed president; said concern having been at that time recently organized and established in the City of Aberdeen engaged in the business of buying and selling automobiles, new and second hand, making sales of automobiles on what is known as conditional sales contracts, whereby the purchaser of the automobile would pay part cash and the balance of the purchase price being represented by his promissory note and a conditional sale contract, executed in duplicate or triplicate, one copy of which would be filed with the county auditor of Grays Harbor County, Wash. and that on or about November 1st, 1920, the plaintiff herein purchased from the said Bell Motor Company, through its alleged president and manager, D. B. Bell, one of those conditional sale contracts on which there was an unpaid balance of $468.25. That plaintiff bought the same for an investment and for the profit to him from interest to accrue thereon, and that sometime after making said investment, to-wit: on or about the 23rd day of November, 1920, said Bell Motor Company, through its said president and manager, D. B. Bell, solicited the appellant to invest in other conditional sale contracts of the concern, but that the plaintiff, after considering his prior investment and not knowing anything about the financial standing of the Bell Motor Company decided not to make any further investments with the said Bell Motor Company, and so informed its president and manager the said D. B. Bell, although the plaintiff at that time had several thousand dollars available for investment, which fact was known to the defendants herein.

"IV.

"That the said Bell Motor Company was banking with the defendant bank and was in close touch with the other defendants herein, and that the defendants herein were financing the said Bell Motor Company to the extent of making advances to the said Bell Motor Company for the purchase of automobiles, taking the automobiles for security and in turn being repaid for their advances to the Bell Motor Company out of the sales of said automobiles, whether the purchaser paid in cash or in case the purchaser did not pay in cash,

then when the Bell Motor Company sold the conditional sale contract, representing an automobile, the proceeds would go to the defendant bank for the advances made.

## "V.

"That the defendants Chas. Albertson and Norman J. Bruen, on or about November 23rd, 1920, having learned through the said Bell that the plaintiff herein declined to make any further investments in conditional sale contracts, notes and securities of said Bell Motor Company, called personally upon the plaintiff at his place of business and thereupon stated and represented to the plaintiff for and on behalf of themselves and their co-defendant, said bank, that the said Bell Motor Company was not only solvent but that it was in excellent shape financially and was perfectly good and sound in a financial way, doing a large and prosperous business, and that the said D. B. Bell, its president and manager was a man of excellent character and honesty, and that his statements and representations could be absolutely relied upon, and that the plaintiff would be absolutely safe and secure in continuing to invest his money in the conditional sale contracts, including notes then offered to him and which might be thereafter offered to him by the said Bell Motor Company, and the said defendants assured the plaintiff that they had complete knowledge and understanding of all the financial affairs of the Bell Motor Company and knew that what they stated to the plaintiff was true. That the proposed plan whereby the plaintiff was to handle the notes and conditional sale contracts of the said Bell Motor Company, as represented to the plaintiff by the defendants and as well known to the defendants, in addition to an assignment of the conditional sale contracts and notes by the Bell Motor Company to the plaintiff, involved a written guarantee of the Bell Motor Company of the payment of said securities by the Bell Motor Company and the defendants, each and all, acting jointly and in concert, represented to the plaintiff, and assured the plaintiff in the most positive and emphatic way, that the Bell Motor Company was absolutely responsible and financially

good on any and all such guarantees that they might give to the plaintiff in connection with said transactions, and that D. B. Bell was perfectly and absolutely good financially and that the plaintiff could rely absolutely on the truth and correctness of any and all representations that the said Bell might make to the plaintiff.''

There were further allegations in the complaint that respondent relied upon the statements above recited in the complaint and believed them to be true, and consented to and did make further investments by buying from the Bell Motor Company five additional conditional sale contracts aggregating $3,409.22, each conditional sale contract being attached to, or accompanied by, the promissory note of the purchaser, and each note and contract was assigned to respondent by the Bell Motor Company, with a written guarantee of payment by it, so that the Bell Motor Company became guarantor of each of such notes and contracts. It is further alleged that the transactions with the Bell Motor Company extended from November 23, 1920, to January 21, 1921, and that during that period of time appellants herein reiterated and repeated to respondent their statements and representations as to the high financial standing, solvency and financial ability of the Bell Motor Company to meet its obligations and pay its debts, and repeated their representations as to the high moral character, standing and financial ability and resources of D. B. Bell, all of which were believed by respondent, and relied upon by him in making the purchases of such securities, without which representations and statements on the part of appellants he would not have purchased any of such securities.

It is further alleged that each and all of the representations and statements made by appellants to respondent were false and untrue, and known by appel-

lants to be false and untrue when made, or were made recklessly by them without regard to their truth, and were made by them to respondent with the intention and purpose on the part of appellants that respondent would act and rely upon the same, and that he did rely upon the same, by reason of which a fraud was perpetrated upon respondent, and that, in truth and in fact, the Bell Motor Company and D. B. Bell were at all times grossly insolvent, with liabilities many times in excess of their assets, and D. B. Bell was also insolvent and wholly without means or property, and instead of being a man of good character and standing and business ability, he was in fact a cheat and swindler, and that all of the securities, conditional sale contracts, and notes accompanying the same, offered by him and his company to respondent, and which appellants urged respondent to buy, were forgeries and worthless, and no such persons as the purported purchasers of the automobiles in the conditional sale contracts existed, nor were there any such automobiles in existence as described in the conditional sale contracts, but the names of the vendees in the conditional sale contracts and the notes accompanying the same were fictitious, and fictitious names were forged and signed by Bell and the Bell Motor Company and signed to the same.

Appellant, the bank, demurred separately, and appellants Albertson and Bruen demurred jointly as individuals, to the complaint, and both the demurrers were overruled.

At the conclusion of the evidence for respondent, motions were made by appellants, respectively, for nonsuit; as to the bank separately, and as to the two individuals defendants, each being denied. At the conclusion of all of the evidence, motions were made by each and all of the appellants for directed verdicts, which also were denied. After judgment, motions

were made for judgment n. o. v. or, in the alternative, for a new trial, which were also denied.

Errors are assigned by appellants in overruling the demurrer of the bank, in overruling the separate demurrers of the individual defendants, in denying the motion for nonsuit, and the motion for a directed verdict, and the motion for judgment n. o. v., or for a new trial. Other errors are assigned in the giving and refusing of instructions.

The determination which we have arrived at upon this appeal avoids a discussion of many of the contentions made by appellants, and most of them we consider untenable.

The complaint was good as against demurrer, as stating a cause of action against both the bank and the individual defendants. Albertson and Bruen were president and cashier, respectively, of the bank. The complaint alleged false and fraudulent representations made by Albertson and Bruen as representing the bank, on November 23, 1920. It also alleges the falsity of the representations, that they were relied upon, and that the president and cashier of the bank, when making the representations, knew them to be false, or made them recklessly not knowing them to be true, resulting in damage. These representations, under decisions of this court too numerous to prolong this opinion by citing, constitute representations of fraud and deceit, and the bank would be as liable for the tort of its managing officers, the president and cashier, if made in its behalf, as was testified by respondent, as any other principal. *Nevada Bank of San Francisco v. Portland National Bank,* 59 Fed. 338; *National Bank v. Graham,* 100 U. S. 699; *Stewart v. Wright,* 147 Fed. 321. A multitude of state and Federal cases are cited in the last cited case to sustain that contention as to the liability

of a bank for torts such as deceit and fraud. All would therefore be liable for the tort, jointly and severally.

But, brushing aside all other questions, while *scienter* was sufficiently alleged in the complaint to hold each and all of the appellants liable for the alleged deceit and fraud, yet, in our opinion, it was in no wise proven, and it is essential that it be proven. Proof must follow allegation.

A man may do many acts which are justifiable or not, according to whether he is ignorant or not ignorant of certain facts. He may pass a counterfeit coin when he is ignorant that it is counterfeit, and will be guilty of no offense, but if he knew the coin to be counterfeit, which is called the *scienter,* he is guilty of passing the coin for money.

The very essential of an action for deceit and fraud is *scienter* as distinguished from an action for the breach of a warranty or guaranty. *Northwestern Steamship Co. v. Dexter Horton & Co.,* 29 Wash. 565, 70 Pac. 59.

When respondent closed his case, he had presented to the jury facts which the jury evidently resolved in his favor as against contradictory evidence, and which we must so resolve, to the effect that, prior to November 23, 1920, he had purchased two contracts, of his own volition, from the Bell Motor Company; that he then notified Bell that he did not intend to purchase any more, but intended to put his money into contracts with the Stewart Motor Company, with whom he also did business of the same kind; that he did not know Mr. Bell or the Bell Motor Company well, and did know Stewart of the Stewart Motor Company, and had done business with that firm for a number of years; that, on November 23, 1920, a little before 6 o'clock in the evening, Albertson and Bruen came to respondent's place of business of their own accord, and Albertson,

the president, said that he came for the Aberdeen National Bank with regard to purchasing automobile contracts from the Bell Motor Company; that the bank was intending to finance paper for the Bell Motor Company so the Bell Motor Company could bring in cars and sell them, and as fast as they were sold and the money paid for their purchase price the bank would release their security upon the cars; that Mr. Albertson then told respondent that he had looked up Bell, and also the financial standing of the Bell Motor Company, and had found that Bell was a man of excellent character and habits, and that the Bell Motor Company was in excellent financial condition, well organized, and doing a large and prosperous business, and any statements given respondent by Bell or his company could be fully relied upon, and he would be absolutely safe and secure in purchasing such contracts from the Bell Motor Company, and that it would be an absolutely safe way to invest his money.

Respondent then asked Albertson why, if the company was so good, the bank did not handle the paper, and Bruen, the cashier, then spoke up and said that it was against the banking laws for a bank to have any of the automobile contracts, but they would advance money to the Bell Motor Company to bring in cars, and with the proceeds from the sale of the contracts the Bell Motor Company would pay back to the bank whatever money the bank had advanced on them. Respondent then said that he would not have time to check up on the contracts of the Bell Motor Company, and Bruen then said that the bank would at all times know what automobiles it, the Bell Motor Company, was selling; that respondent could absolutely rely upon that paper. Respondent then asked how long he should keep on taking the paper, and Bruen said the bank would notify him when to quit taking the paper. Respondent then

told them that he would continue to take the paper from the Bell Motor Company. He testified that he relied on the representations that were then made, and if they had not made such representations he would not have taken any more contracts from the Bell Motor Company; that after that time he purchased the five contracts alleged in his complaint, and that after he had purchased three of them he believed, or suspected, that they were all made in the same handwriting, signatures and all, and he went to the bank and showed the contracts to Bruen, the cashier, and told him that he, respondent, thought they were not all right; that Bruen looked them over thoroughly and told him that they were all right, that there was nothing wrong with them; that he then continued to rely upon the representations that had been previously made, and bought the other two contracts.

It is undisputed that all of the contracts purchased by respondent were forged and spurious. That would be immaterial, however, as to the liability of appellants, for if the notes and contracts proved to be worthless from any cause, such representations as were alleged to have been made by appellants would have the same effect.

There is not one scintilla of evidence that, at the time appellants made the alleged representations to respondent, the man Bell was dishonest. All the evidence on behalf of both parties is to the effect that up to a little before the time when he absconded, about the first of February, 1921, Bell bore a good reputation; had lived five years in Chehalis, Washington; had purchased a home there; had done business and bore a good reputation for honesty and business capacity. Bruen and Albertson had opened the appellant bank on November 1, 1920. Bell had arrived from Chehalis about October 20 previous. Respondent had become

acquainted with Bell before appellants had, and had bought two contracts from him. The evidence on behalf of respondent is that the prospects and opportunities to build up an excellent and prosperous business by the Bell Motor Company were exceedingly bright. There is no evidence that, under the test of insolvency existing in this state—that is, that the assets exceeded the liabilities, and the power to pay debts in due course —either the Bell Motor Company or Bell was insolvent on November 23, 1920, or for some time thereafter. It is true that the Bell Motor Company passed into bankruptcy in February, 1921, but no presumption arises therefrom that insolvency existed on or about November 23, 1920.

If it be said that, at the time respondent's case closed and appellants made their motion for nonsuit, the court did not abuse its discretion in denying the motion, then when appellants had introduced their evidence, most of which was uncontradicted, the case was strengthened for them, as follows:

That appellants had received a letter from the Coffman-Dobson Bank & Trust Company, of Chehalis, addressed to the appellant bank, signed by the cashier of the Coffman-Dobson bank, who had been such for eight years in Chehalis, stating that Bell was a very successful salesman; of good habits; that he had accumulated quite a little money before he left Chehalis; that the Coffman-Dobson bank had had dealings with Bell, which had always been satisfactory; that, while the Coffman-Dobson bank was not familiar with the details of his business in Aberdeen, nor what sort of a statement he showed, the appellant bank could rely upon the statement; that the Coffman-Dobson bank was one of the largest and most trustworthy banks in Southwestern Washington; that Bell had lived in Chehalis for five years; that he had always borne a good reputa-

tion for business ability and for honesty and reliability. Next there was a statement furnished appellant bank, at its request, by R. G. Dunn & Company, dated December 12, 1920, showing that Bell himself was reasonably solvent, and the Bell Motor Company solvent. This statement was supported by the statement of Bell, for and on behalf of himself and the Bell Motor Company, to about the same effect. Bell had also furnished a statement to appellants in November. The account of the Bell Motor Company opened on the first day appellant bank began business, with a deposit of two hundred dollars. During the first month of business, November, 1920, the total deposits aggregated $4,403. The largest item of these deposits was $1,205. There was a balance on hand of the Bell Motor Company at the end of the month of $416.

From all the foregoing evidence it is evident that, when appellants closed their case, and rebuttal evidence did not contradict any material fact so shown, there was still not only no evidence of *scienter* on the part of appellants, that is, that they knew on November 23, 1920, that Bell and the Bell Motor Company were insolvent, or that they knowingly and falsely represented that Bell and his company were amply solvent and financially in good condition, or recklessly and without knowing the facts made such statements, or that there was reason to believe that Bell was dishonest, or that appellants recklessly and without knowledge of the facts recommended him to be absolutely honest and reliable. On the contrary, the evidence is undisputed that they had good reason to believe that the Bell Motor Company and Bell were solvent; that, on the contrary, they had good reason to believe that Bell was honest and reliable, and had no reason to believe otherwise until the forgery was discovered about the last of January, 1921.

It is true that the trial court submitted the very question under consideration to the jury as a question of fact, and charged the jury that "unless they found that the Bell Motor Company was in fact insolvent, and that defendants then knew of such insolvency and made the alleged representations with intent to deceive, or that the representations were made without information upon which a reasonably prudent man might act, the jury must find for the defendants, if their verdict depended upon the insolvency of the Bell Motor Company." Similar instructions were given as to the honesty and credit of Bell and the Bell Motor Company. The court also properly instructed the jury: "The law assumes that parties in their dealings are actuated by proper motives, and that therefore good faith with regard to such dealings would be presumed until the contrary is alleged and made to appear by clear and convincing evidence."

It is manifest that these instructions apply to facts which were not present. There were no facts before the jury to justify the instructions. Our own case of *Northwestern Steamship Co. v. Dexter Horton & Co.,* *supra,* settles this question.

In that case, it is true, the determination was upon the sustaining of a demurrer by the lower court to the complaint alleging fraud and deceit, and it was held that the complaint in that case, considering all the facts, did not show *scienter.* 14 A. & E. Ency. Law (2d ed.), p. 86, was quoted and approved in that case, as follows:

"By the overwhelming weight of authority, in order to render a person liable for false representations in an action of deceit, it must be shown that he made the representations *scienter,*—that is, either with actual knowledge of their falsity, or under such circumstances that the law will imply or impute knowledge, as in the

case of reckless statements, without knowledge whether they are true or false, representations made for a fraudulent purpose, though without actual knowledge of their falsity, and representations accompanied by a false assumption of knowledge, express or implied. As a general rule an action of deceit cannot be maintained if a false representation is made in honest belief that it is true.''

Then the following statement was quoted with approval from 8 Ency. Pl. & Pr. 901:

''As a general rule, false representations not being fraudulent or actionable, unless made with knowledge of their falsity, or stated as the truth when the person has no knowledge on the subject, *scienter* must be expressly alleged in a declaration or complaint for false representation and deceit, or specific allegations must be used which sufficiently import knowledge.''

This court then proceeded:

''And it seems to be well supported by the authority there noted. It will be observed the complaint avers that plaintiff was induced to make the sale of the steamship upon positive representations of the solvency of Shirk by the defendants, and that plaintiff had no other knowledge than thus obtained; that such representations were false, and plaintiff was injured thereby. It is apparent there is no direct allegation of deceit or moral fraud of the defendants. . . .

'' 'The rule that there must be an intention to deceive applies with full force, if not with peculiar force, to false representations as to the solvency or credit of another.' 14 A. & E. Ency. Law (2d ed.), 103.

''However, where such representations are made positively or recklessly, and without knowledge, by one to the injury of another, the fraud consists in the false statement that one has such knowledge.''

See, also, *Kimber v. Young*, 137 Fed. 744, and the discussion of cases and authorities therein.

To close an already overlong opinion, we are well convinced that, when the evidence was all in, the mo-

tion of the several appellants for directed verdicts in their favor should have been granted.

The judgment is therefore reversed with instructions to dismiss the action.

MAIN, C. J., TOLMAN, and MACKINTOSH, JJ., concur.