## No. 14,770.

COLORADO NATIONAL BANK OF DENVER *v.* SIMPSON.

(121 P. [2d] 663)

Decided January 26, 1942.

Messrs. BARTELS, BLOOD & BANCROFT, Mr. PAUL P. EAGLETON, for plaintiff in error.

Mr. LEWIS DER. MOWRY, for defendant in error.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

AN action as in assumpsit, by defendant in error against one Hilton. Pursuant to writ of attachment in aid thereof, there was garnishment against plaintiff in error. Judgment entered against Hilton in the sum of $2,500, and against the garnishee in the sum of $598, $500 of which was the sum the garnishee possessed of Hilton's funds at the time of the service of the garnishment writ, the balance being for interest thereon from the time of such service to the date of judgment.

There was evidence—evidently believed by the trial court—to the effect that in April, 1935, Hilton and two others, acting in confederation, and employing a fake horse racing bunco or confidence game, despoiled defendant in error of $2,500; that in August, 1936, Hilton contacted defendant in error, and stated to him that her two confederates had been apprehended and were in Denver county jail. She besought defendant in error to refrain from filing charges against them, suggesting that of the $2,500 involved she still had $500, which she offered to return in consideration of such refrenation. Defendant in error agreed to the suggestion, and to Hilton's further suggestion that she deposit the $500 with plaintiff in error in escrow. August 10, 1936, escrow was consummated as was contemplated. September 9, 1936, and while the Hilton deposit continued with plaintiff in error, defendant in error instituted this action, and invoked attachment and garnishment as stated.

Hilton did not defend against the action, but plaintiff in error, having inadvertently returned the sum men-

tioned in the escrow to Hilton notwithstanding the garnishment writ, and asserting that Hilton had a "good and sufficient defense upon the merits," which, although plaintiff in error "often requested her to enter her appearance in the case and defend it upon its merits, * * * she failed and refused to do so," it sought and was given leave to answer and defend against the claim in its own behalf. Pursuant to such leave, and after admitting the fact of the escrow, the attachment and garnishment, and its error in paying the deposit to Hilton, plaintiff in error made code denial of the allegations of defendant in error's complaint, and was content otherwise to allege that personal service on Hilton was not obtained, and that the affidavit for publication of summons, to which there had been resort by defendant in error, was insufficient in that it did "not state in it that the residence and whereabouts of the defendant are * * * unknown;" hence, as further answered, "the court does not have jurisdiction over the defendant nor of the res, and that any judgment rendered against the defendant or garnishee will be void."

On trial, only defendant in error testified, and his evidence was substantially as already set forth. The item of interest was allowed on showing that plaintiff in error had unduly delayed recovery by defendant in error, and had deliberately harassed and annoyed him, to his damage in the amount of legal interest on the sum withheld for the time appearing.

The points urged for reversal are sufficiently comprehended in the following: (1) That since the claim of defendant in error was of tort predication, proof thereof did not support the complaint based on an implied contract; (2) that the manner of service of process on Hilton did not warrant entry of judgment against her; (3) that the evidence does not support the complaint; (4) that public policy operates to defeat the claim; and (5) that in any event, interest was not allowable.

■ 1. While the facts indicate a tortious element and would support an action as for a tort, still recovery may be sought and justified on the same facts by reason of the implication involved, as here pleaded. The evidence warranted the conclusion that Hilton was of those who took and possessed the funds of defendant in error in the sum and manner already stated, and her liability on an implied contract for the whole thereof may not be gainsaid. Cooley on Torts (4th ed.), vol. 1, pp. 175, 176, §61; Restatement of the Law — Restitution, p. 522; *Brown's Estate v. Stair,* 25 Colo. App. 140, 150, 136 Pac. 1003, 1007; *Reyer v. Blaisdell,* 26 Colo. App. 387, 143 Pac. 385; *Selkregg v. Thomas,* 27 Colo. App. 259, 149 Pac. 273; *Chudnovski v. Eckels,* 232 Ill. 312, 319, 83 N.E. 846. See, 13 C.J., p. 245, 17 C.J.S., contracts, §6.

■ 2. It is true that while the affidavit in support of petition to publish summons might well have employed the exact language of section 45 of Code of Civil Procedure, in a given and emphasized instance, still we are disposed to the view that there is sufficient particularity of statement in the affidavit otherwise, to satisfy the requirements. It was made clearly to appear that neither the residence address nor the post-office address was known or ascertainable. Liberality of construction of section 45 is enjoined by section 46A.

■ 3. We think, as did the trial court, that the evidence supported the allegations of the complaint. Simpson testified that Hilton said "We have $500 of your money." Her reference, of course, was to the money the three conspirators, one of whom was Hilton—each having active part in their total effort—took from defendant in error in the circumstances appearing. May it be said that the action of defendant in error must fail because, forsooth, the money involved, and all of it, was not shown to have been in the physical possession of the woman Hilton? Her conduct does not justify application of strained niceties. It is to be remarked that she is not here, nor was she in the trial court, making

such or any plea. Indeed, as the allegations of the pleadings of plaintiff in error, undenied, indicate, it urged her to appear and defend against the claim, to no avail. Considering that plaintiff in error had previously restored to Hilton the deposit which defendant in error was seeking to have applied toward the discharge of his claim, it is not surprising that she thought well of staying out of a court of justice. It is conceivable, in view of her connection with the matter, that she was without desire to appear in any court.

4. We are not disposed to believe that the conduct of defendant in error was such as to preclude him from effort through court process to recover judgment against those, or any of them, who had "buncoed" him out of his savings. He was not asked to bet on a horse race nor did he. There was no race. One of the two men conspirators pretended to defendant in error and his male companion (the latter feigning innocence) that he had made successive bets on races until his winnings aggregated $16,000, but that the "United Turf Exchange," with offices in all principal cities, through which he made the wagers resulting in the princely gains indicated, as a prerequisite to making payment to him, demanded that he exhibit currency in the sum of several thousand dollars, thus to establish his ability to have paid that which he wagered, had he lost instead of winning. Then it was that Hilton, the female of the trio of confederated schemers, appeared, and, professing to be the secretary of the "Exchange," and to have immediate charge of its funds, exhibited a considerable "roll" of money, which she stated to be $16,000, and offered to make payment to the "winner" thereof upon proper exhibition of the sum the winning bettor had wagered, but which he had not "put up" at the time he made the bet. At that point, the two men considered and appraised their ability to produce the sum required. They found that their combined resources in that regard fell short in the sum of $2,500. That sum, on their promise

to divide the $16,000 three ways, they induced defendant in error to withdraw from his bank savings. About the time he had gathered his funds, the winning bettor received "orders" from the "Exchange" to go to Salt Lake City, where, as he said, a branch was conducted. There, defendant in error was further induced to trust his $2,500, then in cash, with one of the men for exhibition to those in charge of the Salt Lake office. By methods common to such gentry, the one who became possessed of defendant in error's money disappeared from sight, and the other man, noting that he had forgotten to give the first man his card of membership in the Exchange, without which he would be unable to identify himself, and professing to have a sprained ankle, induced defendant in error to rush delivery of the essential card to the first man. As an incredulous person would have anticipated the expected result obtained— both men got out of the view of the victim, and his money with them. The woman, Hilton, although, when "exhibiting $16,000," as stated, she posed as the responsible head of the "Denver Branch Exchange," was able to leave her Denver responsibilities and be in Salt Lake City when the final chapter was written. No action on the part of defendant in error throughout the process by which he was fleeced of $2,500, was illegal. He was only foolish. But, it may be asked, what of his agreement with Hilton, the woman buncoist, in relation to the $500? She sought him out, and representing as already related, she placed that sum in escrow. The provision in the escrow agreement was that the deposit should be delivered to defendant in error upon the authorization of a well known Denver attorney, but in event such authorization was not presented by September 10, 1936, the deposit should be returned to Hilton. To prevent that happening, and that the deposit might be safeguarded in the interest of defendant in error's action against Hilton, based as already stated, it was attached through garnishment. Plaintiff in error's re-

turn of the deposit to Hilton notwithstanding the garnishment, constitutes the material interest ·of plaintiff in error. That preceding the formal escrow agreement, defendant in error assured Hilton he would not take steps to prosecute her men confederates, must be weighed in the light of circumstances. Is the Temple of Justice to be closed to this unsophisticated young man because of that informal promise to one of his criminal despoilers? His action is not upon her promise to pay him $500 for his forbearance in the matter of the prosecution, but upon the implied promise of legal predicate obtaining against those who swindled him out of $2,500. Clearly, his action against her was just and well-founded. The garnishment was incidental, and that defendant in error indulged in dissembling when talking to Marie Hilton, should not operate, as we perceive, to free the sum attached in the manner indicated, from the lawful writ of the court. There is no evidence that Hilton's confederates were prosecuted, or that defendant in error testified or failed to testify in any such prosecution. If Hilton were here, would it lie in her mouth to say that the promise of defendant in error to her, in the circumstances of the record, voided his·claim against her arising out of the original swindling deal? We think not, nor is plaintiff in error in better position. The cases of *Baker v. Couch,* 74 Colo. 380, 221 Pac. 1089, and *Baker v. Sockwell,* 80 Colo. 309, 251 Pac. 543, upon which reliance is placed as foreclosing defendant in error's action, are distinguishable. The consideration for the formal contract upon which those actions were based, was confessedly immoral. Here, the action is on an implied contract which the law recognizes as a means to recovery by one who has been over-reached through a tortious transaction. We think the case of *Stewart v. Wright,* 147 Fed. 321 (CCA-8), presents a·parallel to this record, and we subscribe to the philosophy advanced by the court there in behalf of one who had been victimized in manner as here. We commend that opinion

and the authorities therein reviewed for the enlightenment of any who may be interested.

5. The right of plaintiff in error to defend as advised, and its embarrassment was of no little moment, is not to be questioned, but we are impressed with the conclusion of the trial court that unreasonable delay resulted from its unnecessary zeal in the premises. The visitation of interest burden was justified. See, 28 C.J., pp. 246-248, §§341-343.

Let the judgment be affirmed.

MR. JUSTICE BAKKE and MR. JUSTICE BURKE dissent.

MR. JUSTICE BURKE dissenting.

This, as I read the record, is the situation here: Simpson entered into what he understood was a gambling venture; which, even as such, he understood was "fixed." There were alleged profits. To secure his share of these he put up good money with his confederates. They absconded with it. Two of them were later arrested and held on a criminal charge. The third, suspecting Simpson would be a damaging witness against them, sought him out and entered into an agreement with him that if he would not testify she would return $500 of his purloined cash. To guarantee performance the money was put up in escrow with the bank which had no information concerning the consideration. Through an honest error the bank returned it to the conspirator. Simpson now seeks, through his garnishment, to compel the bank to pay him.

To grant Simpson relief against the bank we must put the stamp of our approval on his crooked gambling deal as well as his agreement not to testify whereby alone he secured the return of $500 of his lost funds to a place where it would be within the reach of process. To do this we must take the money from the bank, which would never have touched it had the facts been revealed, and which lost it through an honest mistake.

Simpson should not have gambled. That was contrary to law and public policy. Even so he should not have played what he must have believed was a "fixed" game. That was contrary to law, public policy and good morals. But for these derelictions he would not be here now. He should not have obtained the deposit of a part of his lost money by a contract to violate a statute. That was contrary to law and public policy. Had he not done this he would not be here now. He should have advised the bank that it was being made a stakeholder in a contract to violate the law under an escrow agreement which the bank was not free to execute without becoming a party to the violation. Had he done so the bank would never have accepted the escrow and he would now have no claim against it. The bank should, of course, have retained the money and answered the garnishment that the amount was in its hands.

It is well settled that where one of two innocent persons must suffer by the act of the third he who put it in the power of the swindler to perpetrate the fraud must stand the loss. If such be the rule where both are innocent it can scarely fail of applicability to one who, as here, is twice guilty.

It is said the Couch and Sockwell cases are not in point because in each the contract was immoral while here it is one "which the law recognizes." I think the only contracts here involved are: (1) Simpson's contract for a cut in a crooked gambling venture; (2) Simpson's contract not to testify; (3) the bank's contract to act as stakeholder in the latter. Simpson's part in each of these was immoral. If the law "recognizes" such contracts it is in bad company and its hands are dirty. I think the Stewart case, cited in the court's opinion, supports it save for the element here injected by the agreement not to testify. That precedent, however, is not binding in this court and is, I think, contrary to the' Couch and Sockwell decisions which are. Moreover, the opinion in the Stewart case was written by Judge Hook

62

with whom Judge Adams concurred, while the third member of the court, the very able Judge Sanborn, in a powerful dissent, demolished it.

I think the judgment should be reversed. Mr. Justice Bakke concurs herein.